## Reifsnyder, Appellant, *v.* Pittsburgh Outdoor Advertising Company.

Argued April 24, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and MCBRIDE, JJ.

*John C. Hanna,* with him *John A. Metz, Jr.,* and *Metz, Cook, Hanna & Kelly,* for appellant.

*Elder W. Marshall* and *Eugene B. Strassburger,* with them *Reed, Smith, Shaw & McClay,* and *Strassburger & McKenna,* for appellees.

*William H. Eckert,* with him *Roderick G. Norris,* and *Eckert, Seamans & Cherin,* and *David M. Gooder,* and *Lord, Bissell & Brook,* of the Illinois Bar, for appellee.

OPINION BY MR. JUSTICE BELL, June 30, 1959:

This is an appeal from the final decree of the Court of Common Pleas of Allegheny County dismissing plaintiff's complaint in equity.

Plaintiff is a minority stockholder in the defendant Pittsburgh Outdoor Advertising Company. He owns 130 shares. The individual defendants are officers and/or directors of the corporate defendant. The essential facts are undisputed and may be briefly stated:

Pittsburgh Outdoor Advertising Company had outstanding 15,000 shares of which General Outdoor Advertising Company owned 9,252 shares or approximately 61%. This parent-subsidiary relationship between Pittsburgh and General violated the anti-trust laws and resulted in a consent decree being entered in 1929. In September 1955, the entry of another consent decree became imminent, the terms of which would in all likelihood prevent Pittsburgh from taking advantage of profitable expansion opportunities. Thereafter, negotiations began between Pittsburgh and General relative to the purchase of the Pittsburgh stock held by General. After a survey of Pittsburgh's real estate, its Board of Directors determined that the book value of its stock was $233.16 per share.

Henry Posner (President), representing Pittsburgh, Robbins (President), Bauers (Vice President) and Olson (Treasurer), representing General, met in an attempt to negotiate a sale. General carried its 9,252 shares of Pittsburgh stock on its books at a total value of $1.00. The consent decree of October 21, 1955, required General to dispose of its stock in Pittsburgh at "not less than a fair market value". Olson offered General's stock to Pittsburgh for $2,400,000. Posner said that the whole Company "isn't worth anything over $3,500,000." After some further conversations Rob-

bins, as President of General, then said "We have an obligation to our stockholders, to our directors, and there is one fixed figure from which I cannot get away and that figure is $2,150,000 [$232.38 a share]. You either pay that figure or we can't do business." Thereupon, Posner, in behalf of Pittsburgh, closed the deal at that price.

On October 11, 1955, the Board of Directors of Pittsburgh notified all stockholders of a special meeting to be held December 12, 1955 (1) to authorize the purchase of the 9,252 shares at a total price of $2,-150,000, and (2) to increase the company's indebtedness from nothing to $2,000,000 in order to finance the stock purchase.

Pittsburgh was unable to secure a loan of $2,000,000. However, the Equitable Life Assurance Society of the United States agreed to lend Pittsburgh $1,650,000. Pittsburgh itself had surplus cash of $175,000, making a total of $1,825,000 available for the purchase of General's stock. In order to secure the $325,000 needed to meet General's price, defendant Posner, Pittsburgh's President, offered to buy 1400 shares of the 9,252 shares which Pittsburgh was buying from General—at $232.38 a share.

On December 1, 1955, the stockholders of Pittsburgh were notified that at the special meeting of December 12, 1955, they would be asked to authorize the sale of the aforesaid shares to Mr. Posner.

At the December 12th meeting, plaintiff's proxy protested the purchase, claiming, inter alia, that the price of $232.38 was excessive. He likewise protested the sale to Posner for the anomalous reason that the price was too low. Posner then offered the 1400 shares to plaintiff at the same price, but plaintiff's proxy declined the offer. Despite plaintiff's objections, all three

resolutions were passed.* On December 13, 1955, the loan and the purchases were completed. That same day plaintiff instituted this action.

Plaintiff's basic complaints are three-fold: (1) the price of $232.38 per share was excessive; (2) the directors should have obtained an outside appraisal of the Company and of the value of its closely held stock, and (3) consequently the individual defendants violated their fiduciary duty to the corporation. The Chancellor found that $232.38 per share "was fair, reasonable and not excessive"; and that "Pittsburgh's officers and directors acted in good faith and with ordinary prudence and skill"; and these findings were confirmed by the Court en banc.

In this closely held Company, in which the officers and directors of Pittsburgh knew the actual value of their stock, we agree with the Court below that under such circumstances it was unnecessary for them to obtain any outside appraisal except an appraisal of the real estate owned by the Company. However, two independent appraisers testified that the fair and reasonable value of the stock was the price at which it was purchased—its reappraised book value.

Moreover, Pittsburgh's directors and stockholders felt that they had to purchase this block of "control stock" in order to continue the present management and to prevent an outsider or competitor from getting control of the Company. The market value of a large or controlling block of stock is of course materially affected by (a) the condition and the prospects of the Company and (b) the large or limited number of possible purchasers.

We note in passing that the wisdom of this purchase has been made apparent by the fact that since that time

---

* Plaintiff's 130 shares were the only votes against the three resolutions.

the corporation has been very successful. In two years it has repaid Equitable Life Assurance Society $537,000—approximately one-third of the principal of the entire loan which, by its terms, was to be repaid over a period of 12 years—and it is likewise paying dividends to its stockholders of $12 a share. There was no fraud, actual or legal; there was no waste of the Company's assets, or over-reaching, or violation of duty by the directors or by the stockholders of Pittsburgh Outdoor Advertising Company. Cf. *Chambers v. Beaver Advance Corp.*, 392 Pa. 481, 140 A. 2d 808, as to the rights and duties of stockholders.[*]

Because of the unusual facts, and the appellant's charges of breach of fiduciary duty, we have discussed the merits at some length. However, we intend to decide this appeal on another point.

Plaintiff's complaint prayed for a decree voiding all acts of Pittsburgh, and requiring all the transactions to be voided and the status quo to be restored. Obviously, that is impossible. In order to rescind the purchases and to return to General the stock which was purchased by Pittsburgh, and to invalidate and repay to Equitable the loan which it made to Pittsburgh— General Outdoor Advertising Company, Inc., and the Equitable Life Assurance Society would have to have

---

[*] We agree with the Court below that General Outdoor Advertising Company, Inc., as a stockholder of Pittsburgh, had the right to vote its shares in favor of the resolution authorizing the purchase by Pittsburgh of General's stock, and the right to vote its shares in favor of the resolution authorizing an increase in Pittsburgh's indebtedness, and the right to vote its shares in favor of the resolution authorizing the sale to Posner of the 1400 shares above mentioned, although even if General's votes were not counted, the remaining affirmative votes were still a majority of stockholders entitled to vote, and all the resolutions were legally adopted: *Chambers v. Beaver-Advance Corp.*, 392 Pa. 481, 488, 489, 140 A. 2d 808.

been joined as indispensable parties, defendants. Plaintiff's failure to join these indispensable parties in the present suit leaves a Court of Equity without jurisdiction to grant the relief prayed for or any substantial relief whatever, and the appeal must be quashed.

In *Powell v. Shepard*, 381 Pa. 405, 113 A. 2d 261, the Court said (page 412) : "The absence of indispensable parties 'goes absolutely to the jurisdiction, and without their presence the court can grant no relief': Hartley v. Langkamp and Elder, 243 Pa. 550, 556, 90 A. 402. . . . And, a party is indispensable where his rights are so connected with the claims of the litigants that no decree can be made between them without impairing such rights: . . ."

In *Hartley v. Langkamp and Elder*, 243 Pa. 550, 90 A. 402, the Court said (page 556) : "It is a settled rule of equity jurisprudence that as the absence of an indispensable party goes to the jurisdiction of the court, an objection to the proceeding on that ground may be raised at any time, during the hearing or on an appeal from the decree of the trial court . . ."

See also *Forbes Road Union Church and Sunday School v. Salvation Army*, 381 Pa. 249, 113 A. 2d 311; *Hanna v. Chester Times*, 303 Pa. 252, 154 A. 591.

Appeal quashed; costs to be paid by appellant.

---

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE COHEN :

I agree that this appeal should be quashed because of the failure of the plaintiff to join an indispensable party. I do not agree with the dicta in the majority's opinion wherein the majority discusses the merits of the controversy. It is for this reason that I feel compelled to express my views on the merits.

The record presents the following set of circumstances:

General Outdoor Advertising Company, Inc. owned a majority of the issued and outstanding common stock of the Pittsburgh Outdoor Advertising Company. (9,252 of a total of 15,000). As a result of a consent decree entered against General in the United States District Court for the Northern District of Illinois, it became necessary for General to dispose of its holdings in Pittsburgh. The Board of Directors of Pittsburgh, three of whom were officers or directors of General and all of whom were elected by General, chose to purchase all of General's stock in Pittsburgh. Pittsburgh did not have sufficient cash or liquid assets to accomplish the purchase so it pledged substantially all of its assets to the Equitable Life Assurance Society in order to borrow the necessary funds. I feel that whenever a corporation offers to purchase all of the shares of the majority or all the shares of a controlling interest in a corporation, the corporation is obligated to offer to acquire, at the same price, all the shares of any dissenting shareholder or group of shareholders.

Fair dealing, fiduciary responsibility, and the direct obligation of loyalty owed to all the shareholders, would dictate that a shareholder who did not want to go along with this "bale-out" of the majority should be given the option of disposing of his shares on the same terms and on the same conditions as the retiring majority. Otherwise, the majority shareholders would have at their command a ready purchaser (the corporation) for their holdings—a market that is denied to the minority. And what is even more important, when the corporate market is created by the majority shareholder as it was in the instant case, it becomes more difficult for the minority to dispose of its holdings since the corporation's liquid assets have been depleted to

provide the purchase price for the majority stock. In addition to eliminating the element of unfairness that may or may not exist when the majority "bales" itself out, the extension of the same offer of purchase to the minority would eliminate the difficult proof problem of breach of fiduciary duty or of anticipated future harm to the corporation, and also would prevent disputes over what a proper sales price for the stock would be. It might be argued that this offer may force the dissolution of the corporation in some cases. That is all the more reason why the majority should not be permitted to liquidate its holdings through the utilization of the corporate assets without also extending the same opportunity of sale to the minority shareholder. Here the majority stockholder has abandoned its fiduciary responsibility to the minority and this Court should not, even by way of dicta, countenance such action.

Mr. Justice MCBRIDE joins in this concurring and dissenting opinion.