Donahue v. Rodd Electrotype Co. of New England, Inc.

EUPHEMIA DONAHUE vs. RODD ELECTROTYPE COMPANY OF
NEW ENGLAND, INC. & others.[1]

Middlesex.    October 8, 1974. — May 2, 1975.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Corporation,* Stockholder, Purchase by corporation of its stock, Close
corporation.  *Sale,* Of stock.  *Fiduciary.*

Stockholders in a close corporation owe one another substantially the
same fiduciary duty in the operation of the enterprise that part-
ners owe to one another, namely, a duty of the utmost good faith
and loyalty.  [587]

Directors, officers and members of a majority stockholders' group in
a close corporation who authorized and agreed to the corporate
purchase of a number of shares at a fixed price for the corporate
treasury from one of the majority stockholders' group, but did not
offer the minority stockholder the same opportunity to sell shares
to the corporation for the same price, breached their fiduciary
duty to the minority stockholder who was entitled to relief in the
alternative, namely, either the stockholder whose shares were
purchased by the corporation was obligated to remit to the corpo-
ration the amount paid to him for the stock plus interest in return
for the same number of shares of corporate treasury stock, or the
corporation was obligated to purchase a similar number of shares
from the minority shareholder for the same price, without interest,
as paid to the majority stockholder.  [600-604]

BILL IN EQUITY filed in the Superior Court on June 7,
1971.

The suit was heard by *Mitchell,* J.

After review by the Appeals Court, the Supreme
Judicial Court granted leave to obtain further appellate
review.

*William M. O'Brien* for the plaintiff.
*Harold E. Magnuson* for the defendants.

---

[1] The other defendants are Harry C. Rodd, Charles H. Rodd,
Frederick I. Rodd, and Mr. Harold E. Magnuson.

TAURO, C.J.   The plaintiff, Euphemia Donahue, a minority stockholder in the Rodd Electrotype Company of New England, Inc. (Rodd Electrotype), a Massachusetts corporation, brings this suit against the directors of Rodd Electrotype, Charles H. Rodd, Frederick I. Rodd and Mr. Harold E. Magnuson, against Harry C. Rodd, a former director, officer, and controlling stockholder of Rodd Electrotype and against Rodd Electrotype (hereinafter called defendants).   The plaintiff seeks to rescind Rodd Electrotype's purchase of Harry Rodd's shares in Rodd Electrotype[2] and to compel Harry Rodd "to repay to the corporation the purchase price of said shares, $36,000, together with interest from the date of purchase."[3]   The plaintiff alleges that the defendants caused the corporation to purchase the shares in violation of their fiduciary duty to her, a minority stockholder of Rodd Electrotype.[4]

---

[2] In her original bill of complaint, the plaintiff alleged numerous breaches of the fiduciary duties owed to her by the individual defendants in their respective capacities as controlling stockholders and directors.   Essentially, she contended that the individual defendants were diverting Rodd Electrotype assets for the benefit of the Rodd family.   She requested injunctive relief and restitution of misappropriated funds.   At the trial in the Superior Court, the plaintiff's counsel stipulated orally that the only transaction challenged in this suit was the purchase of Harry Rodd's stock by Rodd Electrotype.

[3] This language is drawn from the plaintiff's bill of complaint.   The plaintiff also requested "such other and further relief as . . . seems meet and just."

[4] In form, the plaintiff's bill of complaint presents, at least in part, a derivative action, brought on behalf of the corporation, and, in the words of the bill, "on behalf of . . . [the] stockholders" of Rodd Electrotype.   Yet, as noted in footnote 1, *supra*, the plaintiff's bill, in substance, was one seeking redress because of alleged breaches of the fiduciary duty owed *to her*, a minority stockholder, by the controlling stockholders.

We treat the bill of complaint (as have the parties) as presenting a proper cause of suit in the personal right of the plaintiff.   See *John T. D. Blackburn, Inc.* v. *Livermore*, 317 Mass. 20, 21 (1944); *Santa*

The trial judge, after hearing oral testimony, dismissed the plaintiff's bill on the merits.    He found that the purchase was without prejudice to the plaintiff and implicitly[5] found that the transaction had been carried out in good faith and with inherent fairness.    The Appeals Court affirmed with costs.    *Donahue* v. *Rodd Electrotype Co. of New England, Inc.* 1 Mass. App. Ct. 876 (1974).    The case is before us on the plaintiff's application for further appellate review.

The trial judge entered voluntary findings of fact which do not appear to state the complete ground for his decision.    The evidence is reported.    Accordingly, it is the duty of this court to examine the evidence and to form an independent judgment on the facts in the case. Due weight must be given to the findings of the trial judge, who has heard the witnesses and has had an opportunity to gauge their credibility and reliability.    His findings of fact based on oral testimony will not be reversed unless they are plainly wrong.    *Spiegel* v. *Beacon Participations, Inc.* 297 Mass. 398, 407 (1937). *Seder* v. *Gibbs,* 333 Mass. 445, 446 (1956).    However, all inferences to be drawn from the facts are open on this appeal.    *Malone* v. *Walsh,* 315 Mass. 484, 490 (1944). *Seder* v. *Gibbs, supra,* at 447.

The evidence may be summarized as follows:    In 1935, the defendant, Harry C. Rodd, began his employment

---

*Maria* v. *Trotto,* 297 Mass. 442, 447 (1937); *Kagan* v. *Levenson,* 334 Mass. 100, 106 (1956).    The defendants have not demurred to the plaintiff's bill of complaint.    The case was tried on the plaintiff's theory.    The evidence introduced was consistent with litigation of the personal right presented in the bill.    The issue of the duty owed by controlling stockholders to minority stockholders was sufficiently before the trial court.    The issue was raised and argued fully on appeal.    In this instance we prefer substance over form and decide the case on this basis.

[5] Although he does not expressly make these findings, the trial judge quotes the appropriate standard from *Winchell* v. *Plywood Corp.* 324 Mass. 171, 174-175 (1949), in his findings of fact.

with Rodd Electrotype, then styled the Royal Electrotype Company of New England, Inc. (Royal of New England). At that time, the company was a wholly-owned subsidiary of a Pennsylvania corporation, the Royal Electrotype Company (Royal Electrotype). Mr. Rodd's advancement within the company was rapid. The following year he was elected a director, and, in 1946, he succeeded to the position of general manager and treasurer.

In 1936, the plaintiff's husband, Joseph Donahue (now deceased), was hired by Royal of New England as a "finisher" of electrotype plates. His duties were confined to operational matters within the plant. Although he ultimately achieved the positions of plant superintendent (1946) and corporate vice president (1955), Donahue never participated in the "management" aspect of the business.

In the years preceding 1955, the parent company, Royal Electrotype, made available to Harry Rodd and Joseph Donahue shares of the common stock in its subsidiary, Royal of New England. Harry Rodd took advantage of the opportunities offered to him and acquired 200 shares for $20 a share. Joseph Donahue, at the suggestion of Harry Rodd, who hoped to interest Donahue in the business, eventually obtained fifty shares in two twenty-five share lots priced at $20 a share. The parent company at all times retained 725 of the 1,000 outstanding shares. One Lawrence W. Kelley owned the remaining twenty-five shares.

In June of 1955, Royal of New England purchased all 725 of its shares owned by its parent company. The total price amounted to $135,000. Royal of New England remitted $75,000 of this total in cash and executed five promissory notes of $12,000 each, due in each of the succeeding five years. Lawrence W. Kelley's twenty-five shares were also purchased at this time for $1,000. A substantial portion of Royal of New England's cash expenditures was loaned to the company by Harry

Rodd, who mortgaged his house to obtain some of the necessary funds.

The stock purchases left Harry Rodd in control of Royal of New England. Early in 1955, before the purchases, he had assumed the presidency of the company. His 200 shares gave him a dominant eighty per cent interest. Joseph Donahue, at this time, was the only minority stockholder.

Subsequent events reflected Harry Rodd's dominant influence. In June, 1960, more than a year after the last obligation to Royal Electrotype had been discharged, the company was renamed the Rodd Electrotype Company of New England, Inc. In 1962, Charles H. Rodd, Harry Rodd's son (a defendant here), who had long been a company employee working in the plant, became corporate vice president. In 1963, he joined his father on the board of directors. In 1964, another son, Frederick I. Rodd (also a defendant), replaced Joseph Donahue as plant superintendent. By 1965, Harry Rodd had evidently decided to reduce his participation in corporate management. That year, Charles Rodd succeeded him as president and general manager of Rodd Electrotype.

From 1959 to 1967, Harry Rodd pursued what may fairly be termed a gift program by which he distributed the majority of his shares equally among his two sons and his daughter, Phyllis E. Mason. Each child received thirty-nine shares.[6] Two shares were returned to the corporate treasury in 1966.

We come now to the events of 1970 which form the grounds for the plaintiff's complaint. In May of 1970, Harry Rodd was seventy-seven years old. The record indicates that for some time he had not enjoyed the best of health and that he had undergone a number of opera-

---

[6] The trial judge found that gifts in this period totaled forty-nine shares for each child. In this, he was plainly wrong. The parties have stipulated to the proper numbers.

tions.  His sons wished him to retire.  Mr. Rodd was not averse to this suggestion.  However, he insisted that some financial arrangements be made with respect to his remaining eighty-one shares of stock.  A number of conferences ensued.  Harry Rodd and Charles Rodd (representing the company) negotiated terms of purchase for forty-five shares which, Charles Rodd testified, would reflect the book value and liquidating value of the shares.

A special board meeting convened on July 13, 1970. As the first order of business, Harry Rodd resigned his directorship of Rodd Electrotype.  The remaining incumbent directors, Charles Rodd and Mr. Harold E. Magnuson (clerk of the company and a defendant and defense attorney in the instant suit), elected Frederick Rodd to replace his father.  The three directors then authorized Rodd Electrotype's president (Charles Rodd) to execute an agreement between Harry Rodd and the company in which the company would purchase forty-five shares for $800 a share ($36,000).

The stock purchase agreement was formalized between the parties on July 13, 1970.  Two days later, a sale pursuant to the July 13 agreement was consummated. At approximately the same time, Harry Rodd resigned his last corporate office, that of treasurer.

Harry Rodd completed divestiture of his Rodd Electrotype stock in the following year.  As was true of his previous gifts, his later divestments gave equal representation to his children.  Two shares were sold to each child on July 15, 1970, for $800 a share.  Each was given ten shares in March, 1971.[7]  Thus, in March, 1971, the shareholdings in Rodd Electrotype were apportioned as follows:  Charles Rodd, Frederick Rodd and Phyllis Mason each held fifty-one shares; the Donahues[8] held fifty shares.

---

[7] An inference is permissible that the "gift" of these shares was a part of the "deal" for the stock purchase.

[8] Joseph Donahue gave his wife, the plaintiff, joint ownership of his fifty shares in 1962.  In 1968, they transferred five shares to their

A special meeting of the stockholders of the company was held on March 30, 1971. At the meeting, Charles Rodd, company president and general manager, reported the tentative results of an audit conducted by the company auditors and reported generally on the company events of the year. For the first time, the Donahues learned that the corporation had purchased Harry Rodd's shares. According to the minutes of the meeting, following Charles Rodd's report, the Donahues raised questions about the purchase. They then voted against a resolution, ultimately adopted by the remaining stockholders, to approve Charles Rodd's report. Although the minutes of the meeting show that the stockholders unanimously voted to accept a second resolution ratifying all acts of the company president (he executed the stock purchase agreement) in the preceding year, the trial judge found, and there was evidence to support his finding,[9] that the Donahues did not ratify the purchase of Harry Rodd's shares. Cf. *Braunstein* v. *Devine*, 337 Mass. 408, 413 (1958).

A few weeks after the meeting, the Donahues, acting through their attorney, offered their shares to the corporation on the same terms given to Harry Rodd. Mr. Harold E. Magnuson replied by letter that the corporation would not purchase the shares and was not in a financial position to do so.[10] This suit followed.

In her argument before this court, the plaintiff has characterized the corporate purchase of Harry Rodd's

---

son, Dr. Robert Donahue. On Joseph Donahue's death, the plaintiff became outright owner of the forty-five share block. This was the ownership pattern which obtained in March, 1971.

[9] Dr. Robert Donahue's testimony at trial contradicted the minutes of the meeting. He testified that no vote to ratify the acts of the company president had taken place at the meeting.

[10] Between 1965 and 1969, the company offered to purchase the Donahue shares for amounts between $2,000 and $10,000 ($40 to $200 a share). The Donahues rejected these offers.

shares as an unlawful distribution of corporate assets to controlling stockholders. She urges that the distribution constitutes a breach of the fiduciary duty owed by the Rodds, as controlling stockholders, to her, a minority stockholder in the enterprise, because the Rodds failed to accord her an equal opportunity to sell her shares to the corporation. The defendants reply that the stock purchase was within the powers of the corporation and met the requirements of good faith and inherent fairness imposed on a fiduciary in his dealings with the corporation. They assert that there is no right to equal opportunity in corporate stock purchases for the corporate treasury. For the reasons hereinafter noted, we agree with the plaintiff and reverse the decree of the Superior Court. However, we limit the applicability of our holding to "close corporations," as hereinafter defined. Whether the holding should apply to other corporations is left for decision in another case, on a proper record.

A. *Close Corporations.* In previous opinions, we have alluded to the distinctive nature of the close corporation (e.g., *Brigham* v. *M. & J. Corp.* 352 Mass. 674, 678 [1967]; see *Samia* v. *Central Oil Co. of Worcester,* 339 Mass. 101, 112-113 [1959]), but have never defined precisely what is meant by a close corporation. There is no single, generally accepted definition. Some commentators emphasize an "integration of ownership and management" (Note, Statutory Assistance for Closely Held Corporations, 71 Harv. L. Rev. 1498 [1958]), in which the stockholders occupy most management positions. *Kruger* v. *Gerth,* 16 N. Y. 2d 802, 806 (1965) (Fuld, J., dissenting). Foreward, 18 Law & Contemp. Prob. 433 (1953). See *Helms* v. *Duckworth,* 249 F. 2d 482, 486 (D. C. Cir. 1957). Others focus on the number of stockholders and the nature of the market for the stock. In this view, close corporations have few stockholders; there is little market for corporate stock. The Supreme Court of Illinois adopted this latter view in *Galler* v. *Galler,* 32 Ill. 2d 16 (1965): "For our pur-

poses, a close corporation is one in which the stock is held in a few hands, or in a few families, and wherein it is not at all, or only rarely, dealt in by buying or selling." *Id.* at 27. Accord, *Brooks* v. *Willcuts*, 78 F. 2d 270, 273 (8th Cir. 1935). See, generally, F. H. O'Neal, Close Corporations: Law and Practice, § 1.02 (1971).[11] We accept aspects of both definitions. We deem a close corporation to be typified by: (1) a small number of stockholders; (2) no ready market for the corporate stock; and (3) substantial majority stockholder participation in the management, direction and operations of the corporation.

As thus defined, the close corporation bears striking resemblance to a partnership. Commentators and courts have noted that the close corporation is often little more than an "incorporated" or "chartered" partnership.[12] *Ripin* v. *United States Woven Label Co.* 205 N. Y. 442, 447 (1912) ("little more than [although not quite the same as] chartered partnerships"). *Clark* v. *Dodge*, 269 N. Y. 410, 416 (1936). Hornstein, Stockholders' Agreements in the Closely Held Corporation, 59 Yale L. J. 1040 (1950). Hornstein, Judicial Tolerance of the Incorporated Partnership, 18 Law & Contemp. Prob. 435, 436 (1953). Cf. *Barrett* v. *King*, 181 Mass. 476,

---

[11] O'Neal restricts his definition of the close corporation to those corporations whose shares are not generally traded in securities markets. F. H. O'Neal, Close Corporations: Law and Practice, § 1.02 (1971).

[12] The United States Internal Revenue Code gives substantial recognition to the fact that close corporations are often merely incorporated partnerships. The so called Subchapter S, 26 U. S. C. §§ 1371-1379 (1970), enables "small business corporations," defined by the statute (26 U. S. C. § 1371 [a] [1970]), to make an election which generally exempts the corporation from taxation (26 U. S. C. § 1372 [b] [1] [1970]) and causes inclusion of the corporation's undistributed, as well as distributed, taxable income in the gross income of the stockholders for the year (26 U. S. C. § 1373 [a] [1970]). This is essentially the manner in which partnership earnings are taxed. See 26 U. S. C. § 701 (1970).

479 (1902). The stockholders "clothe" their partnership "with the benefits peculiar to a corporation, limited liability, perpetuity and the like." *In the Matter of Surchin* v. *Approved Bus. Mach. Co. Inc.* 55 Misc. 2d (N. Y.) 888, 889 (Sup. Ct. 1967). In essence, though, the enterprise remains one in which ownership is limited to the original parties or transferees of their stock to whom the other stockholders have agreed,[13] in which ownership and management are in the same hands, and in which the owners are quite dependent on one another for the success of the enterprise. Many close corporations are "really partnerships between two or three people who contribute their capital, skills, experience and labor." *Kruger* v. *Gerth*, 16 N. Y. 2d 802, 805 (1965) (Desmond, C.J., dissenting). Just as in a partnership, the relationship among the stockholders must be one of trust, confidence and absolute loyalty if the enterprise is to succeed. Close corporations with substantial assets and with more numerous stockholders are no different from smaller close corporations in this regard. All participants rely on the fidelity and abilities of those stockholders who hold office. Disloyalty and self-seeking conduct on the part of any stockholder will engender bickering, corporate stalemates, and, perhaps, efforts to achieve dissolution. See *Lydia E. Pinkham Medicine Co.* v. *Gove*, 303 Mass. 1

---

[13] The original owners commonly impose restrictions on transfers of stock designed to prevent outsiders who are unacceptable to the other stockholders from acquiring an interest in the close corporation. These restrictions often take the form of agreements among the stockholders and the corporation or by-laws which give the corporation or the other stockholders a right of "first refusal" when any stockholder desires to sell his shares. See *Albert E. Touchet, Inc.* v. *Touchet*, 264 Mass. 499, 502 (1928); Hornstein, Stockholders' Agreements in the Closely Held Corporation, 59 Yale L. J. 1040, 1048-1049 (1950). In a partnership, of course, a partner cannot transfer his interest in the partnership so as to give his assignee a right to participate in the management or business affairs of the continuing partnership without the agreement of the other partners. G. L. c. 108A, § 27. See *Hazen* v. *Warwick*, 256 Mass. 302, 308 (1926).

(1939); *In the Matter of Radom & Neidorff, Inc.* 307 N. Y. 1, rearg. den. 307 N. Y. 701 (1954); *Kruger* v. *Gerth,* 16 N. Y. 2d 802 (1965); *In the Matter of Gordon & Weiss, Inc.* 32 App. Div. 2d (N. Y.) 279, app. withdrawn, 25 N. Y. 2d 959 (1969).

In *Helms* v. *Duckworth,* 249 F. 2d 482 (D. C. Cir. 1957), the United States Court of Appeals for the District of Columbia Circuit had before it a stockholders' agreement providing for the purchase of the shares of a deceased stockholder by the surviving stockholder in a small "two-man" close corporation. The court held the surviving stockholder to a duty "to deal fairly, honestly, and openly with . . . [his] fellow stockholders." *Id.* at 487. Judge Burger, now Chief Justice Burger, writing for the court, emphasized the resemblance of the two-man close corporation to a partnership: "In an intimate business venture such as this, stockholders of a close corporation occupy a position similar to that of joint adventurers and partners. While courts have sometimes declared stockholders 'do not bear toward each other that same relation of trust and confidence which prevails in partnerships,' this view ignores the practical realities of the organization and functioning of a small 'two-man' corporation organized to carry on a small business enterprise in which the stockholders, directors, and managers are the same persons" (footnotes omitted). *Id.* at 486.

Although the corporate form provides the above-mentioned advantages for the stockholders (limited liability, perpetuity, and so forth), it also supplies an opportunity for the majority stockholders to oppress or disadvantage minority stockholders. The minority is vulnerable to a variety of oppressive devices, termed "freeze-outs," which the majority may employ. See, generally, Note, Freezing Out Minority Shareholders, 74 Harv. L. Rev. 1630 (1961). An authoritative study of such "freeze-outs" enumerates some of the possibilities: "The squeezers [those who employ the freeze-out techniques] may refuse to declare dividends; they may drain

off the corporation's earnings in the form of exorbitant salaries and bonuses to the majority shareholder-officers and perhaps to their relatives, or in the form of high rent by the corporation for property leased from majority shareholders . . .; they may deprive minority shareholders of corporate offices and of employment by the company; they may cause the corporation to sell its assets at an inadequate price to the majority shareholders . . .." F. H. O'Neal and J. Derwin, Expulsion or Oppression of Business Associates, 42 (1961). In particular, the power of the board of directors, controlled by the majority, to declare or withhold dividends and to deny the minority employment is easily converted to a device to disadvantage minority stockholders. See *Hayden* v. *Beane,* 293 Mass. 347 (1936); *Lydia E. Pinkham Medicine Co.* v. *Gove,* 303 Mass. 1, 11-12 (1939); *Casson* v. *Bosman,* 137 N. J. Eq. 532 (Ct. E. & A. 1946); *Patton* v. *Nicholas,* 154 Texas 385, 393 (1955). Cf. *Taylor* v. *Standard Gas & Elec. Co.* 306 U. S. 307, 323 (1939).

The minority can, of course, initiate suit against the majority and their directors. Self-serving conduct by directors is proscribed by the director's fiduciary obligation to the corporation. *Elliott* v. *Baker,* 194 Mass. 518, 523 (1907). *Sagalyn* v. *Meekins, Packard & Wheat, Inc.* 290 Mass. 434, 438 (1935). However, in practice, the plaintiff will find difficulty in challenging dividend or employment policies.[14] Such policies are considered to be within the judgment of the directors. This court has said: "The courts prefer not to interfere . . . with the sound financial management of the corporation by its directors, but declare as a general rule that the declaration of dividends rests within the sound discretion of the directors, refusing to interfere with their determination unless a plain abuse of discretion is made to appear."

---

[14] It would be difficult for the plaintiff in the instant case to establish breach of a fiduciary duty *owed to the corporation,* as indicated by the finding of the trial judge.

*Crocker* v. *Waltham Watch Co.* 315 Mass. 397, 402 (1944). Accord, *Daniels* v. *Briggs,* 279 Mass. 87, 95 (1932). See *Fernald* v. *Frank Ridlon Co.* 246 Mass. 64, 71-72 (1923); *Perry* v. *Perry,* 339 Mass. 470, 479 (1959). Judicial reluctance to interfere combines with the difficulty of proof when the standard is "plain abuse of discretion" or bad faith, see *Perry* v. *Perry, supra,* to limit the possibilities for relief. Although contractual provisions in an "agreement of association and articles of organization" (*Crocker* v. *Waltham Watch Co., supra,* at 401) or in by-laws (*Lydia E. Pinkham Medicine Co.* v. *Gove, supra*) have justified decrees in this jurisdiction ordering dividend declarations, generally, plaintiffs who seek judicial assistance against corporate dividend or employment policies[15] do not prevail. See *Fernald* v. *Frank Ridlon Co.* 246 Mass. 64 (1923); *Daniels* v. *Briggs, supra*; *Perry* v. *Perry, supra*; *Conviser* v. *Simpson,* 122 F. Supp. 205 (D. Md. 1954); *Berwald* v. *Mission Dev. Co.* 40 Del. Ch. 509 (Sup. Ct. 1962); *Moskowitz* v. *Bantrell,* 41 Del. Ch. 177 (Sup. Ct. 1963); *Casson* v. *Bosman,* 137 N. J. Eq. 532 (Ct. E. & A. 1946); Note, Minority Shareholder Suits to Compel Declaration of Dividends, 64 Harv. L. Rev. 299, 300 (1950); Note, Minority Shareholders' Power to Compel Declaration of Dividends in Close Corporations — A New Approach, 10 Rutgers L. Rev. 723, 724 (1956). But see *Dodge* v. *Ford Motor Co.* 204 Mich. 459 (1919); *Patton* v. *Nicholas,* 154 Texas 385 (1955).

Thus, when these types of "freeze-outs" are attempted by the majority stockholders, the minority stockholders,

---

[15] Attacks on allegedly excessive salaries voted for officers and directors fare better in the courts. See *Stratis* v. *Andreson,* 254 Mass. 536 (1926); *Sagalyn* v. *Meekins, Packard & Wheat, Inc.* 290 Mass. 434 (1935). What is "reasonable compensation" is a question of fact. *Black* v. *Parker Mfg. Co.* 329 Mass. 105, 116 (1952). The proof which establishes an excess over such "reasonable compensation" appears easier than the proof which would establish bad faith or plain abuse of discretion.

cut off from all corporation-related revenues, must either suffer their losses or seek a buyer for their shares. Many minority stockholders will be unwilling or unable to wait for an alteration in majority policy. Typically, the minority stockholder in a close corporation has a substantial percentage of his personal assets invested in the corporation. *Galler* v. *Galler*, 32 Ill. 2d 16, 27 (1965). The stockholder may have anticipated that his salary from his position with the corporation would be his livelihood. Thus, he cannot afford to wait passively. He must liquidate his investment in the close corporation in order to reinvest the funds in income-producing enterprises.

At this point, the true plight of the minority stockholder in a close corporation becomes manifest. He cannot easily reclaim his capital. In a large public corporation, the oppressed or dissident minority stockholder could sell his stock in order to extricate some of his invested capital. By definition, this market is not available for shares in the close corporation. In a partnership, a partner who feels abused by his fellow partners may cause dissolution by his "express will . . . at any time" (G. L. c. 108A, § 31 [1] [b] and [2]) and recover his share of partnership assets and accumulated profits.[16] *Fisher* v. *Fisher*, 349 Mass. 675, 678 (1965). *Fisher* v. *Fisher*, 352 Mass. 592, 594-595 (1967). G. L. c. 108A, § 38. If dissolution results in a breach of the partnership articles, the culpable partner will be liable in damages. G. L. c. 108A, § 38 (2) (a) II. By contrast, the stockholder in the close corporation or "incorporated partnership" may achieve dissolution and recovery of his share of the enterprise assets only by compliance with the rigorous terms of the applicable chapter of the General Laws. *Rizzuto* v. *Onset Cafe, Inc.* 330 Mass. 595, 597-

---

[16] The partnership agreement may control the amount and timing of distribution in a way which is disadvantageous to the retiring partner.

598 (1953). "The dissolution of a corporation which is a creature of the Legislature is primarily a legislative function, and the only authority courts have to deal with this subject is the power conferred upon them by the Legislature." *Leventhal* v. *Atlantic Fin. Corp.* 316 Mass. 194, 205 (1944). To secure dissolution of the ordinary close corporation subject to G. L. c. 156B, the stockholder, in the absence of corporate deadlock, must own at least fifty per cent of the shares (G. L. c. 156B, § 99 [a]) or have the advantage of a favorable provision in the articles of organization (G. L. c. 156B, § 100 [a] [2]). The minority stockholder, by definition lacking fifty per cent of the corporate shares, can never "authorize" the corporation to file a petition for dissolution under G. L. c. 156B, § 99 (a), by his own vote. He will seldom have at his disposal the requisite favorable provision in the articles of organization.

Thus, in a close corporation, the minority stockholders may be trapped in a disadvantageous situation. No outsider would knowingly assume the position of the disadvantaged minority. The outsider would have the same difficulties. To cut losses, the minority stockholder may be compelled to deal with the majority. This is the capstone of the majority plan. Majority "freeze-out" schemes which withhold dividends are designed to compel the minority to relinquish stock at inadequate prices. See *Lydia E. Pinkham Medicine Co.* v. *Gove,* 303 Mass. 1, 12 (1939); *Mansfield Hardwood Lumber Co.* v. *Johnson,* 263 F. 2d 748, 756 (5th Cir.), reh. den. 268 F. 2d 317 (5th Cir.), cert. den. 361 U. S. 885 (1959); *Cochran* v. *Channing Corp.* 211 F. Supp. 239, 242-243 (S. D. N. Y. 1962); *Gottfried* v. *Gottfried,* 73 N. Y. S. 2d 692, 695 (Sup. Ct. 1947); *Patton* v. *Nicholas,* 154 Texas 385, 393 (1955). When the minority stockholder agrees to sell out at less than fair value, the majority has won.

Because of the fundamental resemblance of the close corporation to the partnership, the trust and confidence

which are essential to this scale and manner of enterprise, and the inherent danger to minority interests in the close corporation, we hold that stockholders[17] in the close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise[18] that partners owe to one another. In our previous decisions, we have defined the standard of duty owed by partners to one another as the "utmost good faith and loyalty." *Cardullo* v. *Landau*, 329 Mass. 5, 8 (1952). *DeCotis* v. *D'Antona*, 350 Mass. 165, 168 (1966). Stockholders in close corporations must discharge their management and stockholder responsibilities in conformity with this strict good faith standard. They may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation.

We contrast[19] this strict good faith standard with the somewhat less stringent standard of fiduciary duty to

---

[17] We do not limit our holding to majority stockholders. In the close corporation, the minority may do equal damage through unscrupulous and improper "sharp dealings" with an unsuspecting majority. See *Helms* v. *Duckworth*, 249 F. 2d 482 (D. C. Cir. 1957).

[18] We stress that the strict fiduciary duty which we apply to stockholders in a close corporation in this opinion governs *only* their actions relative to the operations of the enterprise and the effects of that operation on the rights and investments of other stockholders. We express no opinion as to the standard of duty applicable to transactions in the shares of the close corporation when the corporation is not a party to the transaction. Cf. Andrews, The Stockholder's Right to Equal Opportunity in the Sale of Shares, 78 Harv. L. Rev. 505 (1965). Compare *Perlman* v. *Feldmann*, 219 F. 2d 173 (2d Cir.), cert. den. 349 U. S. 952 (1955), with *Zahn* v. *Transamerica Corp.* 162 F. 2d 36 (3d Cir. 1947).

[19] Several scholarly articles have suggested that the standard of duty of stockholding officers in close corporations may be more demanding than the standard applicable to their counterparts in publicly-held corporations. See Brudney and Chirelstein, Fair Shares in Corporate Mergers and Takeovers, 88 Harv. L. Rev. 297, 325, n. 60 (1974); Note, Corporate Opportunity in the Close Corporation — A Different Result? 56 Geo. L. J. 381 (1967).

which directors and stockholders[20] of all corporations must adhere in the discharge of their corporate responsibilities. Corporate directors are held to a good faith and inherent fairness standard of conduct (*Winchell* v. *Plywood Corp.* 324 Mass. 171, 177 [1949]) and are not "permitted to serve two masters whose interests are antagonistic." *Spiegel* v. *Beacon Participations, Inc.* 297 Mass. 398, 411 (1937). "Their paramount duty is to the corporation, and their personal pecuniary interests are subordinate to that duty." *Durfee* v. *Durfee & Canning, Inc.* 323 Mass. 187, 196 (1948).

The more rigorous duty of partners and participants in a joint adventure,[21] here extended to stockholders in a close corporation, was described by then Chief Judge Cardozo of the New York Court of Appeals in *Meinhard* v. *Salmon,* 249 N. Y. 458 (1928): "Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary duties. . . . Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." *Id.* at 463-464.[22]

---

[20] The rule set out in many jurisdictions is: "The majority has the right to control; but when it does so, it occupies a fiduciary relation toward the minority, as much so as the corporation itself or its officers and directors." *Southern Pac. Co.* v. *Bogert,* 250 U. S. 483, 487-488 (1919). Accord, e.g., *Jones* v. *H. F. Ahmanson & Co.* 1 Cal. 3d 93, 108 (1969); *Allied Chem. & Dye Corp.* v. *Steel & Tube Co. of America,* 14 Del. Ch. 1, 12 (Ch. 1923); *Kavanaugh* v. *Kavanaugh Knitting Co.* 226 N. Y. 185, 195 (1919); *Zahn* v. *Transamerica Corp.* 162 F. 2d 36, 42 (3d Cir. 1947). See generally Berle, "Control" in Corporate Law, 58 Col. L. Rev. 1212, 1222 (1958).

[21] We have indicated previously that the duty owed by partners inter sese and that owed by coadventurers inter sese are substantially identical. *Cardullo* v. *Landau,* 329 Mass. 5, 8 (1952). *DeCotis* v. *D'Antona,* 350 Mass. 165, 168 (1966).

[22] These pages of the *Meinhard* case are cited with approval as authority for the standard of duty applicable to joint adventurers and

Application of this strict standard of duty to stockholders in close corporations is a natural outgrowth of the prior case law. In a number of cases involving close corporations, we have held stockholders participating in management to a standard of fiduciary duty more exacting than the traditional good faith and inherent fairness standard because of the trust and confidence reposed in them by the other stockholders. In *Silversmith* v. *Sydeman*, 305 Mass. 65 (1940), the plaintiff brought suit for an accounting of the liquidation of a close corporation which he and the defendant had owned. In assessing their relative rights in the discount of a note, we had occasion to consider the defendant's fiduciary duty with respect to the financial affairs of the company. We implied that, in addition to the fiduciary duty owed by an officer to the corporation, a more rigorous standard of fiduciary duty applied to the defendant by virtue of the relationship between the stockholders: ". . . it could be found that the plaintiff and the defendant were acting as partners in the conduct of the company's business and in the liquidation of its property even though they had adopted a corporate form as the instrumentality by which they should associate in furtherance of their joint venture." *Id.* at 68.

In *Samia* v. *Central Oil Co. of Worcester*, 339 Mass. 101 (1959), sisters alleged that their brothers had systematically excluded them from management, income and partial ownership of a close corporation formed from a family partnership. In rejecting arguments that the plaintiffs' suit was barred by the statute of limitations or laches, we stressed the familial relationship among the parties, which should have given rise to a particularly scrupulous fidelity in serving the interests of all of the

partners in *Mendelsohn* v. *Leather Mfg. Corp.* 326 Mass. 226, 233 (1950), and as authority for "the special liabilities of joint venturers" in *Air Technology Corp.* v. *General Elec. Co.* 347 Mass. 613, 625, n. 16 (1964).

stockholders: "All three brothers . . . were directors of Central, a small family corporation, not a large publicly owned organization, and as such were in a special position of family trust." *Id.* at 112.

In *Wilson* v. *Jennings,* 344 Mass. 608 (1962), the plaintiffs, stockholders in a close corporation, brought suit on their own behalf and on behalf of the corporation against a number of defendants, including the third stockholder who was generally in charge of corporate operations. The corporation had been organized to exploit a "plastic top" for containers invented by the plaintiffs and another. The defendants appealed from a final decree which, inter alia, cancelled shares of stock issued to the operating stockholder after the original issue, voided an employment contract between the operating stockholder and the corporation, and ordered transfer to the corporation of stock in and dividends from a corporation the operating stockholder had established to manufacture the container tops. Although we modified the decree, we sustained the judge's finding that the operating stockholder had violated his duty to the other stockholders in causing other shares to be issued to himself. Justice Cutter wrote for the court: "[I]t was open to the judge on the evidence to find that Wilson, Malick, and Jennings, on an informal and somewhat ambiguous basis . . ., had entered into what was essentially a joint venture in corporate form to exploit the plastic top invention; that Jennings was obligated in order 'to get his third [share of the stock] . . . to do the financing' and to 'be . . . [g]eneral [m]anager of the business, and operate it on behalf of the stockholders'; and that there was a 'mutual understanding that . . . [Wilson and Malick] would know what was going on' on the east coast and that they in turn would keep Jennings informed of their own activities. There was evidence that the three way equal division of stock was to be 'permanent.'

"If the parties arranged for a permanent equal participation in Polytop's operations, and undertook the obligation of disclosure to one another of relevant information, a fiduciary relationship arose, in addition to that . . . between Jennings, as a director, and Polytop. The evidence justified the conclusion that the relationship was to be one of trust and confidence." *Id.* at 614-615.

In these and other cases (e.g., *Sher* v. *Sandler,* 325 Mass. 348, 353 [1950]; *Mendelsohn* v. *Leather Mfg. Corp.* 326 Mass. 226, 233 [1950]), we have imposed a duty of loyalty more exacting than that duty owed by a director to his corporation (*Spiegel* v. *Beacon Participations, Inc.* 297 Mass. 398, 410-411 [1937]) or by a majority stockholder to the minority in a public corporation[23] because of facts particular to the close corporation in the cases. In the instant case, we extend this strict duty of loyalty to all stockholders in close corporations. The circumstances which justified findings of relationships of trust and confidence in these particular cases exist universally in modified form in all close corporations. See *Kruger* v. *Gerth,* 16 N. Y. 2d 802, 806 (1965) (Fuld, J., dissenting). Statements in other cases (*Mairs* v. *Madden,* 307 Mass. 378, 380 [1940]; *Leventhal* v. *Atlantic Fin. Corp.* 316 Mass. 194, 198-199 [1944]; *Cardullo* v. *Landau,* 329 Mass. 5, 9 [1952]) which suggest that stockholders of a corporation do not stand in a relationship of trust and confidence to one another will not be followed in the close corporation context.

B. *Equal Opportunity in a Close Corporation.* Under settled Massachusetts law, a domestic corporation, unless forbidden by statute, has the power to purchase its own shares. *Dupee* v. *Boston Water Power Co.* 114 Mass. 37, 43 (1873). *Dustin* v. *Randall Faichney Corp.* 263 Mass. 99, 102 (1928). *Brown* v. *Little, Brown & Co.* (*Inc.*) 269 Mass. 102, 110 (1929). *Barrett* v. *W. A. Webster*

---

[23] See n. 20, *supra.*

*Lumber Co.* 275 Mass. 302, 307 (1931). *Scriggins* v. *Thomas Dalby Co.* 290 Mass. 414, 418 (1935). *Winchell* v. *Plywood Corp.* 324 Mass. 171, 174 (1949). An agreement to reacquire stock "is enforceable, subject, at least, to the limitations that the purchase must be made in good faith and without prejudice to creditors and stockholders." *Scriggins* v. *Thomas Dalby Co., supra. Winchell* v. *Plywood Corp., supra,* at 174-175. When the corporation reacquiring its own stock is a close corporation, the purchase is subject to the additional requirement, in the light of our holding in this opinion, that the stockholders, who, as directors or controlling stockholders, caused the corporation to enter into the stock purchase agreement, must have acted with the utmost good faith and loyalty to the other stockholders.

To meet this test, if the stockholder whose shares were purchased was a member of the controlling group, the controlling stockholders must cause the corporation to offer each stockholder an equal opportunity to sell a ratable number of his shares to the corporation at an identical price.[24] Purchase by the corporation confers substantial benefits on the members of the controlling group whose shares were purchased. These benefits are not available to the minority stockholders if the corporation does not also offer them an opportunity to sell their shares. The controlling group may not, consistent with its strict duty to the minority, utilize its control of the corporation to obtain special advantages and disproportionate benefit from its share ownership.

---

[24] Of course, a close corporation may purchase shares from one stockholder without offering the others an equal opportunity if all other stockholders give advance consent to the stock purchase arrangements through acceptance of an appropriate provision in the articles of organization, the corporate by-laws (see *Brown* v. *Little, Brown & Co.* [*Inc.*] 269 Mass. 102 [1929]), or a stockholder's agreement. Similarly, all other stockholders may ratify the purchase. Cf. *George H. Gilbert Mfg. Co.* v. *Goldfine,* 317 Mass. 681, 685 (1945); *Winchell* v. *Plywood Corp.* 324 Mass. 171, 176-177 (1949).

See *Jones* v. *H. F. Ahmanson & Co.* 1 Cal. 3d 93, 108 (1969); Note, 83 Harv. L. Rev. 1904, 1908 (1970). Cf. Brudney and Chirelstein, Fair Shares in Corporate Mergers and Takeovers, 88 Harv. L. Rev. 297, 334 (1974).

The benefits conferred by the purchase are twofold: (1) provision of a market for shares; (2) access to corporate assets for personal use. By definition, there is no ready market for shares of a close corporation. The purchase creates a market for shares which previously had been unmarketable. It transforms a previously illiquid investment into a liquid one. If the close corporation purchases shares only from a member of the controlling group, the controlling stockholder can convert his shares into cash at a time when none of the other stockholders can. Consistent with its strict fiduciary duty, the controlling group may not utilize its control of the corporation to establish an exclusive market in previously unmarketable shares from which the minority stockholders are excluded. See *Jones* v. *H. F. Ahmanson & Co.* 1 Cal. 3d 93, 115 (1969); *Reifsnyder* v. *Pittsburgh Outdoor Advertising Co.* 396 Pa. 320, 327 (1959) (Cohen, J., concurring and dissenting).

The purchase also distributes corporate assets to the stockholder whose shares were purchased. Unless an equal opportunity is given to all stockholders, the purchase of shares from a member of the controlling group operates as a *preferential* distribution of assets. In exchange for his shares, he receives a percentage of the contributed capital and accumulated profits of the enterprise. The funds he so receives are available for his personal use. The other stockholders benefit from no such access to corporate property and cannot withdraw their shares of the corporate profits and capital in this manner unless the controlling group acquiesces. Although the purchase price for the controlling stockholder's shares may seem fair to the corporation and other stockholders under the tests established in the prior case law (see

*Spiegel* v. *Beacon Participations, Inc.* 297 Mass. 398, 429 [1937]; *Winchell* v. *Plywood Corp.* 324 Mass. 171, 178 [1949]), the controlling stockholder whose stock has been purchased has still received a relative advantage over his fellow stockholders, inconsistent with his strict fiduciary duty — an opportunity to turn corporate funds to personal use.

The rule of equal opportunity in stock purchases by close corporations provides equal access to these benefits for all stockholders. We hold that, in any case in which the controlling stockholders have exercised their power over the corporation to deny the minority such equal opportunity, the minority shall be entitled to appropriate relief.[25] To the extent that language in *Spiegel* v. *Beacon Participations, Inc.* 297 Mass. 398, 431 (1937), and other cases suggests that there is no requirement of equal opportunity for minority stockholders when a close corporation purchases shares from a controlling stockholder, it is not to be followed.

C. *Application of the Law to this Case.* We turn now to the application of the learning set forth above to the facts of the instant case.

---

[25] Under the Massachusetts law, "[n]o stockholder shall have any pre-emptive right to acquire stock of the corporation except to the extent provided in the articles of organization or in a by-law adopted by and subject to amendment only by the stockholders." G. L. c. 156B, § 20. We do not here suggest that such preemptive rights are required by the strict fiduciary duty applicable to the stockholders of close corporations. However, to the extent that a controlling stockholder or other stockholder, in violation of his fiduciary duty, causes the corporation to issue stock in order to expand his holdings or to dilute holdings of other stockholders, the other stockholders will have a right to relief in court. Even under the traditional standard of duty applicable to corporate directors and stockholders generally, this court has looked favorably upon stockholder challenges to stock issues which, in violation of a fiduciary duty, served personal interests of other stockholder/directors and did not serve the corporate interest. See, e.g., *Elliott* v. *Baker,* 194 Mass. 518 (1907); *L. E. Fosgate Co.* v. *Boston Mkt. Terminal Co.* 275 Mass. 99 (1931). Cf. *Anderson* v. *Albert & J. M. Anderson Mfg. Co.* 325 Mass. 343, 346-347 (1950).

The strict standard of duty is plainly applicable to the stockholders in Rodd Electrotype. Rodd Electrotype is a close corporation. Members of the Rodd and Donahue families are the sole owners of the corporation's stock. In actual numbers, the corporation, immediately prior to the corporate purchase of Harry Rodd's shares, had six stockholders. The shares have not been traded, and no market for them seems to exist. Harry Rodd, Charles Rodd, Frederick Rodd, William G. Mason (Phyllis Mason's husband), and the plaintiff's husband all worked for the corporation. The Rodds have retained the paramount management positions.

Through their control of these management positions and of the majority of the Rodd Electrotype stock, the Rodds effectively controlled the corporation. In testing the stock purchase from Harry Rodd against the applicable strict fiduciary standard, we treat the Rodd family as a single controlling group. We reject the defendants' contention that the Rodd family cannot be treated as a unit for this purpose. From the evidence, it is clear that the Rodd family was a close-knit one with strong community of interest. See *Samia* v. *Central Oil Co. of Worcester*, 339 Mass. 101, 112 (1959). Harry Rodd had hired his sons to work in the family business, Rodd Electrotype. As he aged, he transferred portions of his stock holdings to his children.[26] Charles Rodd and Frederick Rodd were given positions of responsibility in the business as he withdrew from active management. In these circumstances, it is realistic to assume that appreciation, gratitude, and filial devotion would prevent the younger Rodds from opposing a plan which would provide funds for their father's retirement.

Moreover, a strong motive of interest requires that the Rodds be considered a controlling group. When Charles Rodd and Frederick Rodd were called on to represent the

---

[26] The defendants' brief describes the children as "his heirs and the obvious objects of his bounty."

corporation in its dealings with their father, they must have known that further advancement within the corporation and benefits would follow their father's retirement and the purchase of his stock. The corporate purchase would take only forty-five of Harry Rodd's eighty-one shares. The remaining thirty-six shares[27] were to be divided among Harry Rodd's children in equal amounts by gift and sale.[28] Receipt of their portion of the thirty-six shares and purchase by the corporation of forty-five shares would effectively transfer full control of the corporation to Frederick Rodd and Charles Rodd, if they chose to act in concert with each other or if one of them chose to ally with his sister.[29] Moreover, Frederick Rodd was the obvious successor to his father as director and corporate treasurer when those posts became vacant after his father's retirement. Failure to complete the corporate purchase (in other words, impeding their father's retirement plan) would have delayed, and perhaps have suspended indefinitely, the transfer of these benefits to the younger Rodds. They could not be expected to oppose their father's wishes in this matter. Although the defendants are correct when they assert that no express agreement involving a quid pro quo — subsequent stock gifts for votes from the directors — was proved, no express agreement is necessary to demonstrate the identity of interest which disciplines a controlling

---

[27] The mistaken finding of the trial judge that Harry Rodd had only fifty-one shares prior to the corporate purchase becomes significant in assessing motive and interest in this context.

[28] Charles Rodd admitted in his trial testimony that the parties to the negotiations which led to the stock purchase agreement structured subsequent transactions so that each of the Rodd children would eventually own fifty-one shares of corporate stock. The plaintiff points out that this was precisely the number of shares which would permit any two of Harry Rodd's children to outvote the third child and the remaining stockholders.

[29] See n. 28, *supra*.

group acting in unison. See *Sagalyn* v. *Meekins, Packard & Wheat, Inc.* 290 Mass. 434, 438-439 (1935); *Lydia E. Pinkham Medicine Co.* v. *Gove*, 298 Mass. 53 (1937); *Shaw* v. *Harding*, 306 Mass. 441 (1940); *Murphy* v. *Hanlon*, 322 Mass. 683 (1948). See also Berle, "Control" in Corporate Law, 58 Col. L. Rev. 1212, 1215 (1958).

On its face, then, the purchase of Harry Rodd's shares by the corporation is a breach of the duty which the controlling stockholders, the Rodds, owed to the minority stockholders, the plaintiff and her son. The purchase distributed a portion of the corporate assets to Harry Rodd, a member of the controlling group, in exchange for his shares. The plaintiff and her son were not offered an equal opportunity to sell their shares to the corporation. In fact, their efforts to obtain an equal opportunity were rebuffed by the corporate representative. As the trial judge found, they did not, in any manner, ratify the transaction with Harry Rodd.

Because of the foregoing, we hold that the plaintiff is entitled to relief. Two forms of suitable relief are set out hereinafter. The judge below is to enter an appropriate judgment. The judgment may require Harry Rodd to remit $36,000 with interest at the legal rate from July 15, 1970, to Rodd Electrotype in exchange for forty-five shares of Rodd Electrotype treasury stock. This, in substance, is the specific relief requested in the plaintiff's bill of complaint. Interest is manifestly appropriate. A stockholder, who, in violation of his fiduciary duty to the other stockholders, has obtained assets from his corporation and has had those assets available for his own use, must pay for that use. See *Silversmith* v. *Sydeman*, 305 Mass. 65, 74 (1940). Cf. *Spiegel* v. *Beacon Participations, Inc.* 297 Mass. 398, 420 (1937). In the alternative, the judgment may require Rodd Electrotype to purchase all of the plaintiff's shares for $36,000 without interest. In the circumstances of this case, we view this as the equal opportunity which the plaintiff should have re-

ceived. Harry Rodd's retention of thirty-six shares, which were to be sold and given to his children within a year of the Rodd Electrotype purchase, cannot disguise the fact that the corporation acquired one hundred per cent of that portion of his holdings (forty-five shares) which he did not intend his children to own. The plaintiff is entitled to have one hundred per cent of her forty-five shares similarly purchased.[30]

The final decree, in so far as it dismissed the bill as to Harry C. Rodd, Frederick I. Rodd, Charles H. Rodd, Mr. Harold E. Magnuson and Rodd Electrotype Company of New England, Inc., and awarded costs, is reversed. The case is remanded to the Superior Court for entry of judgment in conformity with this opinion.

*So ordered.*

WILKINS, J. (concurring). I agree with much of what the Chief Justice says in support of granting relief to the plaintiff. However, I do not join in any implication (see, e.g., footnote 18 and the associated text) that the rule concerning a close corporation's purchase of a controlling stockholder's shares applies to all operations of the corporation as they affect minority stockholders. That broader issue, which is apt to arise in connection with salaries and dividend policy, is not involved in this case. The analogy to partnerships may not be a complete one.

---

[30] If there has been a significant change in corporate circumstances since this case was argued, this is a matter which can be brought to the attention of the court below and may be considered by the judge in granting appropriate relief in the form of a judgment.