Moriarty, J.
This is a civil action in two counts in which the plaintiff seeks: (1) damages for an alleged unlawful interference with his contract as President and Chief Executive Officer of National Felt Company, Inc. (NFCI), a Delaware corporation with a usual place of business in Easthampton in the County of Hampshire; and (2) damages for an alleged breach of a fiduciary duty of honesty, loyalty, good faith and fairness allegedly owed to him as a minority stockholder of NFCI by the defendant. The case was tried before me, without a jury, during the December 1995 sitting of the court in Springfield. On the basis of the evidence presented at that trial, I made the following amended findings of fact.
I. FINDINGS OF FACT
1. Rubins’s Background and Experience
From 1965 until June 22, 1988, the plaintiff, Donald M. Rubin (Rubin), worked in the employ of National Felt Company, a Massachusetts corporation engaged in the manufacture and fabrication of wool felt and synthetic nonwoven materials with its principal place of business in the Town of Easthampton. The company was owned and operated by Israel Goldberg and his two sons, Herbert A. Goldberg and Albert S. Goldberg, when Rubin began his employment, and eventually by the two Goldberg brothers, Herbert and Albert. Its business was operated out of five old, multi-storied, mill buildings with wooden floors located in Easthampton and Northampton, and the Goldbergs ran the company from one of the Easthampton buildings.
Rubin began his employment as a technical sales manager in the nonwoven division of the company, and eventually worked his way into an executive position. His duties included the purchasing of fiber, seeking out customers, planning production, making sure the products got “out the door,” and following up sales with the company’s customers. He was also given pricing authority subject to guidelines provided by the Goldbergs. However, he was in no way privy to the financial affairs of the company. All accounting work was done in Boston under the Goldbergs’ exclusive supervision. Consequently, although he developed considerable expertise in the production and marketing aspects of the company’s business, he had no experience in financial matters.
2. The Buyout of National Felt Company’s Assets by NFCI
At sometime in 1987, Rubin learned that the Gold-bergs were interested in selling their business. He had met one Karen G. Mills who was a Managing Director of E.S. Jacobs & Company of New York City (Jacobs). Jacobs was in the business of acquiring businesses throughout the country.
Rubin put Ms. Mills in contact with the Goldbergs. That contact resulted in the sale of the assets of National Felt Company and its two subsidiaries[1] to a new Delaware corporation called “National Felt Acquisition Company Inc.” which eventually became National Felt Company, Inc. (hereinafter “NFCI”). The selling price was $34,750,000, plus an assumption by NFCI of certain liabilities of the old National Felt Company.[2]
*607 The actual closing took place on July 22, 1988. On July 20, 1988, a meeting of NFCI’s three person Board of Directors was held by telephone conference call. The directors consisted of Eli S. Jacobs, plus Karen Mills and Roland Knight, both of who were employees of Jacobs. During that meeting, Robert A. Crisafulli, another employee of Jacobs, was elected treasurer of the corporation, Rubin was elected as its secretary, and Roland Knight was elected assistant-secretary. Eli S. Jacobs was elected Chairman of the Board of Directors.
The purchase of the assets by NFCI was financed in major part by the defendant, Household Commercial Financial Services, Inc., a Delaware corporation with its principal place of business in Prospect Heights, Illinois (hereinafter “Household”). On the date of the closing, Household made a “Revolving Loan” to NFCI in the amount of $19,000,000; a “Term Loan” in the amount of $6,500,000; and a “Junior Subordinated Loan” in the amount of $6,500,000 for a total of $32,000,000. In addition, it made a commitment to provide NFCI with a working capital facility of up to $11,000,000. Household’s total commitment was therefore $43,000,000.
The equity capital of NFCI was provided by the purchase of 620,000 shares of common stock (62%) by Eli S. Jacobs at $2.00 per share or $1,240,000; 180,000 shares (18%) by Household at $2.00 per share or $360,000; 150,000 shares (15%) by Rubin at $2.00 per share or $300,000; and 50,000 shares (5%) by four other management employees or $100,000; for a total equity contribution of $2,000,000. This was a highly leveraged buyout, resulting in the creation of a corporation with a debt/equity ratio of over twenty to one.
Rubin borrowed the money with which he purchased his stock.
3. The Secured Credit Agreement
The loans made by Household to NFCI on the date of the closing were secured by a comprehensive Secured Credit Agreement entered into on that date. By that agreement, NFCI granted to Household a lien on and a security interest in all of its assets.
The agreement also provided (§5.3) that on the closing date NFCI would pay to Household a “transaction fee” in the amount of $75,000, and (§5.4) a “closing fee” in the amount of $832,500, both fees to be not refundable under any circumstances. It also provided that on or before the closing date NFCI would pay to Jacobs a broker’s or finder’s fee which was not to exceed $750,000,[3] and a broker’s or finder’s fee to an entity known as Rodman & Renshaw which was not to exceed $250,000.
The Secured Credit Agreement also contained certain “Affirmative Covenants” whereby NFCI agreed to provide Household with: (a) Quarterly Reports as soon as available, but in any event within 75 days after the end of each fiscal quarter, of (i) copies of its unaudited balance sheet at the end of such fiscal quarter and related unaudited statements of income, retained earnings etc. for such fiscal quarter and the portion of the fiscal year through such fiscal quarter; and (b) Monthly Reports as soon as available, but in any event within 30 days after the end of each month, of copies of a consolidated statement of sales, accounts receivable, and accounts payable for such month and the portion of the fiscal year through such month, setting forth in each case and in comparative form the figures for the corresponding periods of the previous fiscal year.
4. Rubin’s Employment Contract
As a part of the overall transaction, Rubin negotiated a written employment contract with NFCI. By the terms of that contract, Rubin was to be employed by NFCI as its President and Chief Executive Officer for a term of five years commencing July 22, 1988. The contract provided that he would “report only to the Board of Directors of NFCI,” and that he would “be vested with all powers incident or necessary to the office of Chief Executive, in accordance "with policies established by, and subject to the authority of the Board of Directors.” It provided that he would “devote substantially all of his time, attention and skill to the business and affairs of NFCI during normal working hours, [would] use his best efforts to advance NFCI’s interests, and [would] not engage in outside business activities (other than managing passive investments) which would interfere with the performance of his duties [there]under.”
By the terms of the contract, Rubin was to receive a base salary of $200,000 per annum, prompt reimbursement of all ordinary and necessary business expenses incurred by him in the performance of his duties, and other fringe benefits including insurance coverage, eligibility to participate in a pension plan, a paid vacation of no fewer that four weeks per year, and a new Cadillac automobile or the substantial equivalent thereof.
The contract provided that it would be terminated by Rubin’s death, and could be terminated by reason of his disability or for cause. “Cause” was defined in the contract as (i) his refusal or failure to devote his full normal working time, attention and energies to the business of NFCI or to use his best efforts to promote NFCI’s interests in accordance with his duties as described in the contract; (ii) acting dishonestly in his relationships with NFCI or any of its employees, customers or suppliers; (iii) committing larceny, embezzlement, conversion or any other act involving the misappropriation of NFCI funds in the course of his employment; (iv) conviction of any crime which could reasonably be expected to affect the reputation of NFCI or Rubin’s ability to perform the duties required to be performed by him under the contract; or (v) material breach of the contract of employment.
*608 Household was aware of the existence and terms of Rubin’s contract at the time of the closing.
5. Employment of a Chief Financial Officer
Rubin dealt with Karen Mills in negotiating his employment contract with NFCI. When he did so, he made it clear to her that he had no experience or training in the financial aspects of running a business. As a result of that conversation, Ms. Mills conducted a search for a Chief Financial Officer for the company and eventually referred two candidates for the position to Rubin. Rubin chose George T. Enos of Upton, Massachusetts who was at that time the Corporate Controller for Quaker Fabric Corporation of Fall River. Enos began work in August of 1988.
After Enos took over the duties of CFO, he hired several new people to assist him. In January or February of 1989, the accounting department of the company was computerized for the first time under the direction of Enos and Karen Mills. Two additional clerks and an accountant were later hired to handle receivables. Enos worked with Karen Mills in the financial and accounting department of the company, and Rubin devoted his efforts to the production and marketing aspects of the company’s business. The arrangement created a somewhat unusual business situation in that the Chief Financial Officer was effectively reporting to the Board of Directors through Ms. Mills rather than to Rubin as Chief Executive Officer.
5(a). The Scope of Rubin’s Activities as CEO of NFCI
NCFI under Rubin carried on essentially the same business as had been carried on by the old National Felt Company under the Goldbergs. It had three divisions: wool felt, cutting and non-woven, each headed by a vice president who reported to Rubin. The Company had approximately 550 employees located in six different facilities in Easthampton and Northampton. Its opening balance sheet placed a value of $15,268,000 on the machinery and equipment.
NCFI manufactured approximately 4,000 different products; it purchased materials from 2,000 different suppliers and sold its goods to approximately 2,000 different customers. As of the time of the inception of NCFI, all record keeping of every kind and nature, including financial, was manually produced and compiled.
Rubin, as chief executive officer, was in charge of all aspects of the Company’s activities except the financial area. All officers and managers, with the exception of the chief financial officer reported to him and were supervised by him. Their functions included purchasing, production, marketing, sales, research and development, personnel, properly management and maintenance.
6. The Initial Success and Capital Expansion
NFCI did very well during its first year of operation under Rubin’s leadership. Its sales were up by about 5% over the sales of the old National Felt Company for the previous year. It made all payments of principal and interest due to Household under its loan agreement and succeeded in making a profit.
In the spring of 1989, Rubin saw what he perceived to be an opportunity to expand NFCI’s capacity in its synthetic nonwoven division which was then running at 100% of capacity. An industrial, two-story, 205,000 square foot building on 5.3 acres of land which was owned by Stanley Home Products and which had been built in 1951 and expanded three times through 1970, was available for purchase for a price of $3.4 million. It had thirteen indoor loading docks and three elevators with 40,000 pounds of capacity each, and was located in Easthampton within 1,000 feet of NFCI’s Synthetic Division, its Wool Felt Division and its Corporate Headquarters.
Rubin planned to acquire the building and equip it with new, state-of-the-art, computerized equipment which would be capable of producing 220-inch wide product at 22 yards per minute, and which would require only four employees to operate it. He estimated that the cost of the project would be $3.4 million for the land and building, $0.6 million for building improvements, and $4 million for machinery and equipment, or a total of $8 million. He applied to Household for an $8 million increase in NFCI’s line of credit with which to finance the new plant.
On June 30, 1989, Household’s Investment Committee approved the requested increase. Rubin was notified of that approval in a letter dated July 10, 1989 in which the terms on which the approval was granted were set forth. On July 12, 1989, Rubin accepted those terms on behalf of NFCI.
The effect of the increase was to increase NFCI’s total debt facilities from $43 million to $51 million, and its Stepdown Revolving Term Loan (SRTL) from $19 million to $27 million. By the terms as amended to accommodate the $8 million dollar increase, NFCI was committed to reduce the SRTL principal by the following amounts in accordance with the following schedule:
(1) $1,050,000 by 7/31/89
(2) $1,333,000 by 7/31/90[4]
(3) $2,550,000 by 7/31/91
(4) $3,333,000 by 7/31/92
(5) $3,750,000 by 7/31/93
(6) $4,300,000 by 7/31/94
(7) $5,500,000 by 7/31/95
(8) $3,190,000 by 7/31/96
(9) $500,000 by 7/31/97
(10) $750,000 by 7/31/98
(11) $750,000 by 7/31/99
NFCI purchased the building from Stanley Home Products and named it the Putnam Building.
*609 7. The Downturn of NFCI’s Fortunes
NFCI’s fortunes began to deteriorate in the fall of 1989 with the onset of the 1989 business recession. Its sales began to slump in November or December of that year. It began to experience the effect of strong competition from the Orient where low labor costs permitted foreign competitors to undersell its products. Its efforts to maintain reasonably low production costs suffered a severe setback when its principal supplier of rayon (one of its essential raw materials) went out of business. It was forced to purchase its rayon in Finland at double the price it had been paying to its previous supplier. It experienced a similar problem in the polyester market. Its operations required the purchase of about 10 million pounds of polyester per year and, despite the recession which was driving most prices downward, the cost of polyester rose by 20 percent. This development alone caused an increase of from $0.5 million to $1 million in NFCI’s costs of production.[5]
NFCI also ran into difficulties with its Putnam project. It had contracted to purchase the new computerized equipment from a German manufacturer, and an unexpected 20 percent increase in the value of the Deutchmark ended up costing NFCI about $400,000. The software cost about $700,000 more than Rubin had expected. The project was not completed on schedule, and when it was it did not immediately produce the results that had been anticipated. The total cost of Putnam was about $12 million, or about $4 million above budget. That was because the final cost of the machinery and equipment was double the cost that had been expected.
The company struggled through 1990 and into 1991. Its net sales fell from $50,398,162 in fiscal 1989 to $47,302,460 in fiscal 1990 to $45,176,308 in fiscal 1991. More significantly, perhaps, its income before taxes fell from a plus $1,677,910 in fiscal 1989 to a minus $3,495,964 in fiscal 1990, and a minus $17,156,116 in fiscal 1991.[6] During that period, it was guilty of a number of defaults in its contractual obligations to Household by reason of its failure to timely provide the various reports required by its Secured Credit Agreement. Household waived any rights that accrued to it by virtue of those defaults. By the end of fiscal 1991, its current liabilities exceeded its current assets by approximately $1,600,000. The situation had deteriorated to the point that its independent auditors in its fiscal 1991 audited financial statement indicated that there was “substantial doubt about the Company’s ability to continue as a going concern.”
8. The Search for Management Assistance
By the winter of 1990-1991, it became apparent that Rubin needed some assistance to turn the company around. At Karen Mills’s suggestion, he contacted Ms. Elizabeth Ederstein who was a principal of a business consulting firm known as New York Consulting Partners and employed her company to prepare a plan to address NFCI’s problems with inventory, quality control and material management. Ms. Ederst-ein worked with Rubin through the end of the 1991 fiscal year. Through her efforts the Company did implement a series of actions to restructure product lines and business strategies. (See n. #6 supra.) Her field of expertise, however, was production and not finance and accounting. She knew nothing about the details of the company’s loan commitments, and she had not been told of NFCI’s defaults on its reporting obligations to Household.
By the end of April of 1991, it was apparent to all parties that NFCI was not going to be able to meet its commitment to reduce the principal of its debt to Household by $2.55 million by July 31, 1991.[7] Its cash flow had become inadequate to meet its interest commitment and operating expenses, and its line of credit, including the $8 million expansion that had been made to accommodate Putnam, was on the verge of exhaustion. The parties, but primarily Karen Mills on behalf of NFCI and Jacobs, and Paul Porter and William Suddath on behalf of Household, therefore began to talk about restructuring the company’s capital structure. Mills was looking for a reduction in Household’s interest rates and a deferment of principal payments, and Porter and Suddath were thinking in terms of a substantial infusion of new equity capital by Jacobs. In a telephone conversation between Karen Mills and Porter on May 7, 19 91, he told her that Rubin would have to be replaced by a “turnaround COO.” She told him she thought Rubin was capable of turning the company around but he did not agree. He told her that this point was really non-negotiable and that it would be something that would be critical for restructuring negotiations to succeed.
At sometime in May of 1991, Ms. Ederstein met with Karen Mills and William E. Suddath and Paul Porter of Household in Jacobs’ New York office. In the course of that meeting Suddath asked Ms. Ederstein what she thought of Rubin. She told him that she thought they were beginning to turn NFCI around and that Rubin was leading the effort. Suddath did not agree. At that time, Household was trying to prevail upon Jacobs to contribute more equity money to NFCI, and he told Ms. Ederstein and Ms. Mills that he thought Rubin would have to be moved out as Chief Executive Officer. He did not suggest that Rubin should be discharged, but he did suggest that he should be “moved upstairs” with grace and made Chairman of the Board with no responsibilities. Ms. Ederstein told him that she felt that Rubin was “critical” to NFCI’s recovery because of his relationship with the company’s major customers and his knowledge of the raw materials that were necessary for the production of its products. At that time she learned for the first time that NFCI had a $2,550,000 principal payment coming due by July 31st, and that the Putnam project had been substan- *610 lially above budget. She did not believe that NFCI would be able to meet the July 31st commitment.
A few weeks later, Ms. Ederstein met with Porter and Suddath again in Chicago. Suddath reiterated his belief that Jacobs through Karen Mills would have to bring in someone else to run the company.
During the spring of 1991, Karen Mills had several discussions with Rubin with regard to bringing in additional management people to help run the company. The addition of a comptroller and of an assistant to the president were discussed and several names were suggested but nothing came of it. At sometime in the late spring or early summer, Karen Mills made an appointment with Rubin to meet her for lunch in Boston. At that meeting she introduced him to Peter Kurzina of Argus Management Company. Argus Management Company was a “crisis management” firm of “turnaround consultants” which had been created by Thomas E. Brew and David J. Farrari to deal with companies in great financial distress.
9. The July 31, 1991 Default
On July 11, 1991, George T. Enos wrote the following letter to Paul Porter of Household:
Dear Mr. Porter:
Pursuant to Section 1A.1.9 of the Secured Credit Agreement dated July 22, 1988, as amended . . . National Felt Company, Inc. is informing Household Commercial Financial Services, Inc. that an unmatured event of default exists. Section 2.1.1 of said agreement states that a reduction in the Revolving Loan Commitment in the amount of $2,550,000 will occur on July 31, 1991. It is anticipated that National Felt Company, Inc. will not have sufficient borrowing availability under its working capital facility to satisfy this reduction.
National Felt Company, Inc. respectfully requests that Household Commercial Financial Services, Inc. delay the aforementioned Revolving Loan Commitment reduction until a future date agreed upon by both parties.
Sincerely,
Copies of that letter were sent to Rubin, Karen Mills and Bob Crisafulli of Jacobs.
On July 17, 1991, Porter sent the following response to Enos.
Deair Mr. Enos:
I received your letter dated July 11, 1991 requesting (hat National Felt be allowed to delay its scheduled $2.550 million commitment reduction on its Revolving Loan Commitment due July 31, 1991.
Please be advised that HCFS does not currently intend to waive the aforementioned reduction or the existing events of defaults under the Credit Agreement. Furthermore, HCFS reserves all its rights and remedies under the Credit Agreement and Related Documents. As you know, we have attempted to discuss with E.S. Jacobs the subject of restructuring the loan, but they have not responded to our initial offer.
Sincerely yours,
Copies of that letter were also sent to Rubin, Karen Mills and Crisafulli.
10. The Employment of Argus Management Corporation
Undoubtedly as a result of Porter’s letter, Karen Mills, acting on behalf of Jacobs, hired Argus Management Company to take control of both the financial and operating sides of NFCI as of July 25, 1991. On July 22, 1991, Peter Kurzina and David Farrari of Argus and Robert Crisafulli of Jacobs visited Rubin in Easthampton and told him that Argus would be taking the company over on the following Thursday. They told him that they expected to be in Easthampton again on that day, and asked him to introduce them to the key employees of the company while they were there. After they left, Rubin contacted Karen Mills in Texas and she confirmed that she was putting the company in Argus’ hands.
On the following day, Rubin wrote a memorandum entitled “PRIORITIES FOR ARGUS MANAGEMENT CORPORATION” which read as follows:
1. Work with Management
2. Complete detailed and accurate Cash Flow Model with:
payables documented by vendor
receivables documented by customer
all periodic expenses identified/documented
all one-time receivables documented
3. Help get the goods out the door
4. Create all necessary reporting for interfacing with Household
5. Develop and build an accurate cost system with accurate shop floor data
6. Support and help aid plant managers in executing their workplan
7. Develop a payment plan with all critical vendors
8. List of cash generation ideas
Rubin faxed a copy of that memorandum to Karen Mills. She became very upset when she received it. She called Rubin and told him that Argus was not working for him. She told him that he would have to cooperate or there would be dire consequences.
Argus took over the management of the company on July 25, 1991. Thomas E. Brew of Argus was in charge. He visited Rubin in Easthampton and told him they needed his help and asked for his cooperation. The Argus team did not intend to relieve him of his title or his job, and they needed his help in dealing with customers and in purchasing raw materials. They did not expect that they would be able to turn NFCI around *611 into a financially sound, profit-making enterprise within one year. The debt and consequent interests payments were much too high for that. On the other hand, they did not intend or expect to take over the management of the company on a permanent basis. Their purpose and intent was to guide NFCI through the period of crisis in which it found itself, find a way to permit it to survive, and eventually return it to its owners in a financially sound condition. Thomas Brew admitted, however, that Argus did not save every company it went into.
On July 25th, Rubin did take the Argus personnel around the various plants and introduced them to the key personnel, but he very much resented having been asked to do so.
One of the first things that Argus did was discharge George Enos as Chief Financial Officer. They did not believe that he had been doing his job, and they had no confidence in his numbers.
On July 29, 1991, Peter Kurzina sent a memorandum to a “Distribution List” of employees who had been authorized to make purchases on behalf of the company. The memorandum stated that nothing was to be purchased by anyone in the company without a properly filled out requisition. It stated further that each requisition had to be approved by Thomas Doherty of Argus or, in Doherty’s absence, by Thomas Brew or Kurzina and then sent to Wayne Schlim for purchasing.
Rubin was not included in the “Distribution List” but a copy of the memorandum and the “Distribution List” was sent to him. The memorandum was not intended to apply to him. One of his principal areas of expertise which Argus hoped to exploit was his knowledge of the fibers that were the raw materials for a large portion of the company’s products, and it was anticipated that the purchase of such materials would be under his control. He nevertheless took umbrage when he received the copy of the memorandum. He had developed a dislike for Kurzina when he had first been introduced to him by Karen Mills in Boston a month of two earlier. Kurzina was a key member of the Argus team assigned to the NFCI project, but he was subordinate to and reported to Thomas Brew. Brew had a considerable respect for Rubin’s knowledge of the company’s production methods and his relationship with its customers and wished to retain them.
11. Household’s Attempt to Limit Additional Credit
On July 31, 1991, Paul Porter of Household wrote the following letter to Karen Mills at Jacob’s New York office.
Dear Karen:
As you know, under the Secured Credit Agreement with National Felt, a principal payment of $2.55 million and an interest payment of approximately $758,000 are due on Wednesday, July 31, 1991. National Felt currently has less that $2.5 million in cash and available credit under its working capital line of credit. Unless the payments due on July 31, 1991 are paid in full, an Unmatured Event of Default shall occur pursuant to Section 13.1.1 of the Secured Credit Agreement. If payment is not made in full within 5 days after July 31, 1991, an Event of Default shall occur under the Secured Credit Agreement.
We remain interested in working out a restructuring of National Felt’s capital structure that is fair and likely to meet the company’s needs going forward; and are encouraged to learn that you have recently taken steps to strengthen the senior management of the company, which we consider to be essential to any successful restructuring. However, we are currently not willing to continue to fund the company’s losses unless we reach agreement with respect to a restructuring.
Several times over the last few months, we have asked you to begin discussions regarding the restructuring of the company’s capital structure and have relayed to you our ideas on an appropriate solution. We have demonstrated patience and flexibility by agreeing to your requests to delay negotiations at various times in the past few months. But we have always made it clear that we expected a resolution prior to the July 31st payment date.
On Tuesday, July 23, 1991 you indicated to us that you would not be in a position to address the restructuring for another 30 to 90 days. While we are willing to allow you and Argus some time to develop a reasonable plan for the company around which we would hope to develop a mutually agreeable restructuring of the company’s capital structure, we are not willing to continue to fund the company’s losses in the meantime. That posture is entirely consistent with our position regarding the restructuring of National Felt and originally communicated to you on May 14, 1991.
Pursuant to Section 12.2.1 of the Secured Credit Agreement, we have no obligation to make Loans if an Unmatured Event of Default or an Event of Default (a “Default”) has occurred and is continuing. In order to allow you time to discuss this situation with Mr. Jacobs and others, we will continue to fund Loans until August 2, 1991 so long as the other conditions precedent set forth in the Secured Credit Agreement are met and no other Defaults have occurred. Unless all required payments are made on or before August 2, 1991, or E.S. Jacobs & Company can satisfy us that we will not be put in the position of funding the company’s losses, we will only make additional Working Capital Loans after such date and until September 6, 1991 in an aggregate amount not to exceed $200,000 and only so long as the other conditions precedent set forth in the Secured Credit Agreement *612 are met and no other Defaults have occurred (giving a total Working Capital Line equal to the outstand-ings on August 2nd plus $200,000).
Nothing contained in this letter shall be deemed to (i) waive any of our rights and remedies under the Secured Credit Agreement with respect to any other existing or hereafter arising Defaults or (ii) amend any of the provisions of the Secured Credit Agreement or any Related Documents.
Best regards,
Porter’s letter drew an angry response from Karen Mills. On August 2, 1991, she wrote a letter to him in which she stated that his letter came as a “complete surprise” and seriously endangered the welfare of NFCI. With regard to his reference to the strengthening of senior management she responded as follows:
2. Your letter suggests that you were “surprised” (albeit pleasantly) by the Company’s recent change in senior management. We find that difficult to understand. As you are well aware, the Company made that drastic management change at Household’s insistence. On May 14, William Suddath of Household required this change as a first step in the restructuring process. In our letters of July 11 and July 12, we advised you of our progress on these changes. On July 23, we advised you in writing that we had complied with your request and that as of July 25th, Argus Management was placing experienced crisis managers in control of both the financial and operating sides of the Company. Over the five days since their start you have had frequent conversations with new management. It is our understanding that you have arranged to meet with them next week to discuss the restructuring process. Moreover, in a letter dated July 28, 1991, Household requested all types of financial data concerning the Company and its restructuring, including 8 week rolling cash flow forecasts beginning 8/5/91, projections for 1992 and 5 year forecasts for the Company.
She concluded her letter with a request for a meeting on Monday, August 5, 1991, to ask that Household “reconsider the damaging actions that [he] had threatened and that [Household] continue to work with the Company to find a mutually acceptable solution to the Company’s current dilemma."
On August 2, 1991, Thomas Brew of Argus also wrote to Porter, but in a more conciliatory tone. His letter was as follows:
Dear Paul:
Your letter dated July 31, 1991 to Karen Mills of E.S. Jacobs & Company has been forwarded to me.
As you know, on July 25, 1991, Argus Management Corporation was hired to replace existing management of National Felt Company (“NFC”) to restructure NFC’s operations. At that time, I understood that our retention had the approval of Household Commercial and that Household would be supportive of our restructuring efforts. In the six days we have spent at NFC, we have begun that restructuring process, have had several conversation (sic) with Household personnel about our restructuring and have begun preparing the numerous financial data you have requested. Until the receipt of your letter, we had believed that Household’s position was supportive of this process.
That is why I was surprised by your letter. Certainly, Household can not believe that cutting off NFC’s access to its working capital will assist in the restructuring. In addition, it was my understanding that it has not been a secret that NFC would not be able to make its July 31 payment to Household. That fact has been well known for a long time, and it was my understanding that it precipitated your desire to have old management of NFC replaced.
My team and I have just begun our efforts to restructure NFC. We believe that a successful company can emerge from this process and that Household’s returns (as well as the returns of all other creditors and equity holders) will be enhanced significantly by our efforts. We hope that Household will work with us in a constructive manner toward that end and will reconsider its position set forth in the July 31, letter. I look forward to meeting you on Monday.
Veiy truly yours,
Brew gave copies of both Karen Mills’s letter and his letter to Rubin. Rubin was upset when he read Karen Mills’s letter because he had not been informed of the meeting of May 14th or the letters of July 11, July 12 and July 23 that were referred to in her letter.
A meeting was held in Chicago on the following Monday. Karen Mills was present and introduced Brew and other members of the Argus team to Porter, Suddath and other Household personnel who were present. Brew presented the Household representatives with an outline of Argus’s proposed course of action, including its intention to retain Rubin with his same title, office space and compensation, and utilize his expertise on the production side of the business and his long-standing relationships with the company’s larger customers. The Household people seemed receptive of the proposals, including the manner in which Brew intended to use and treat Rubin.
When Brew returned to Easthampton, he gave Rubin a full report of what had transpired at the Chicago meeting. At that moment he believed that Rubin was satisfied with what had been accomplished and content to assume the role and duties that had been planned for him.
12. Rubin’s Termination of his Employment
Rubin, however, was not happy with the position in which he found himself and he sought legal advice. He contacted Karen Mills and told her of his discontent. *613 She suggested that he discuss the matter with a person in Jacob’s New York office to see if some sort of a termination package could be worked out. After talking to that person, Rubin told Karen Mills that he wanted the last two years of his contract and to have the company buy back his stock for what he had paid for it. She told him that such a proposal was unacceptable.
Rubin for many years, both under the Goldbergs before the buy-out and as Chief Executive Officer after the buy-out, had been authorized to give “credits” to customers who wanted to return products they had purchased. That authority was taken away from him in mid-August.
On August 16, 1991, Rubin wrote a letter to the company alleging that it had breached its employment contract with him by “constructively discharging” him.
On that same date, he wrote another letter to Eli S. Jacobs and Karen Mills alleging that their actions over the past several months had constituted a “constructive discharge” and that he intended to hold they responsible for all damages resulting therefrom. In the letter to Jacobs and Karen Mills, he also complained that their actions constituted a breach of the fiduciary duty owed him as a minority stockholder of the company. On or about the same day, he went to his office in the company’s headquarters and removed all of his personal effects.
13. The Subsequent Restructuring of NFCI’s Debt
On August 7, 1991, Paul Porter wrote a letter to Karen Mills in response to her letter of August 2nd to him. That letter read in part as follows:
The actions outlined in our July 31 letter do not cut off the company’s funds; instead it sets forth certain conditions under which funding can continue until September 6, 1991. These actions are consistent with our previous statements of not advancing additional funds, over the present funding levels, to support the company’s losses going forward.
We believe the strengthening of the management team is indeed a positive move. Due to the fact that the company failed to meet its projected performance goals for the past two years, that fundamental information such as operating profit by plant has been unavailable and that the Putnam capex project came in 30% over budget, we had lost confidence in the previous management team. Based on the changes you made with Argus, it appears you decided that management needed to be improved. We hope your choice of Argus proves to be correct.
Over the past 6 months, the EBITDA[8] of the company has been less than the interest expense, resulting in a net loss of over $1 million. Over the next several weeks, the company may be able to generate cash through working down receivables and inventory. This does not imply that the company is not incurring losses. In fact, it only means that the collateral for the HCFS loan is being deteriorated, thereby putting us in a worse position.
In closing, let me say that HCFS is still very interested in working with you and the company to successfully restructure National Felt. We are only saying that the equity should support the company’s cash needs while this is accomplished, instead of the debt. Our statements of not funding any more of the losses are not threats, they are merely our position. I do not believe that these actions are damaging. I do believe that if the equity chooses not to support the company’s cash needs, that would be damaging.
As of the time when Argus took over the management of the company, Household was still trying to prevail upon Jacobs to make a new infusion of equity capital into the company and Jacobs was resisting those efforts. Household appears to have given up that effort by October 1, 1991, however, because on that date it made a restructuring proposal which would have increased the total debt capital from $48 million to $52 million and left the equity capital at the $2 million where it had been since the beginning. Under that proposal, the additional $4 million debt would have been for a term of 7 years at a fixed rate of interest of 10% with $3 million coming from Jacobs and $1 million coming from Household. Jacobs did not go along with that proposal either, however, and Household ended up putting in the entire additional $4 million. The debt payments were restructured to provide a more favorable rate of interest for the company on the outstanding debt, and to postpone principal payment on that debt for a period of four years.
Despite the restructuring of the company’s debt, Argus was still unable to turn the company around and Household continued to increase the amount of the debt. It appears that the loans eventually reached a total of $65 million which Household finally settled for a payment of only $5 million. The identities of the beneficiaries of the debacle, if any, did not appear in evidence.
II. APPLICABLE LEGAL PRINCIPLES
1. Intentional Interference with Contract
In the first count of his complaint, Rubin seeks damages from Household for an alleged unlawful interference with his employment contract with NFCI. In United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 551 N.E.2d 20 (1990), the Supreme Judicial Court established that to maintain an action for such a tort, a plaintiff must prove that (1) he had a contract with a third party, (2) the defendant knowingly induced the third party to break that contract, and (3) the plaintiff was harmed by the defendant’s actions. In that case the court abandoned use of the word “maliciously” in the description of any element of the tort and adopted the word “improperly” in its place. The court held that *614 lo be actionable the interference must be both intentional and improper. A defendant’s liability may arise from either improper motives or from the use of improper means.
If the defendant’s motive for interfering with the plaintiffs contract was to hurt the plaintiff because of his hatred or ill will toward him, or to discriminate against him because of his race, age, sex, religion or national origin, his interference would be improper within the meaning of the law. On the other hand, even if his motive for interfering with the plaintiffs contract was a proper one, but he accomplished the interference by the use of threats, misrepresentation, defamation, fraud or other improper means, he may be held liable for his actions.
In this case it is clear that Rubin did have a valid contract of employment with NFCI. It is also clear that Household did knowingly induce NFCI’s board of directors to employ a “turnaround” management team and thereby to replace Rubin as the actual but not the titular Chief Executive Officer of NFCI. Passing for the moment the issue as to whether that action by the board of directors constituted a breach of Rubin’s employment contract under the circumstances that existed at the time, it becomes necessary to determine whether Household acted for either an improper motive or by improper means.
There is no evidence whatsoever of any improper motive on the part of Household, and Rubin does not suggest that there is. He contends, however, that the means Household employed to accomplish its end were improper for two reasons — first because they constituted a breach of Household’s fiduciary duty of utmost loyalty and good faith that was owed to him as a fellow minority stockholder of NFCI (which is also the basis of the second count of his complaint), and second because they induced a breach of a legally enforceable, written contract.
The means that Household employed to induce NFCI to employ a turnaround management team and thereby to displace Rubin was making such action a condition precedent to restructuring negotiations with NFCI. It is therefore necessary to consider whether the imposition of such a condition precedent constituted a breach of a fiduciary duiy owed by Household to Rubin.
2. Fiduciary Duty of a Minority Stockholder
In Donahue v. Rodd Electrotype Company of New England, Inc., 367 Mass. 578, 328 N.E.2d 505 (1975), the Supreme Judicial Court held that stockholders in a close corporation owe to one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another. It noted that it had previously defined that standard as the “utmost good faith and loyalty” and proclaimed that stockholders in close corporations must discharge their management and stockholder responsibilities in conformity with this strict good faith standard. “They may not,” the court said, “act out of avarice, expediency or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation.” (Id. at 593.) Furthermore, the court made it clear, in a footnote, that its holding applied to minority stockholders as well as to majority stockholders. “In a close corporation,” the court said, “the minority may do equal damage through unscrupulous and improper ‘sharp dealings’ with an unsuspecting .majority.” (Id. at 593, n. 17.)
In Donahue the court defined a close corporation as typified by: (1) a small number of stockholders; (2) no ready market for the corporate stock; and (3) substantial majority stockholder participation in the management, direction and operations of the corporation. (Id. at 586.)
A little over a year later, however, in Wilkes v. Springside Nursing Home, Inc., 370 Mass. 842, 353 N.E.2d 657 (1976), the court tempered the Donahue standard somewhat by introducing as a possible exception the concept of a “legitimate business purpose.” The court said: “(n]evertheless, we are concerned that untempered application of the strict good faith standard enunciated in Donahue to cases such as the one before us will result in the imposition of limitations on legitimate action by the controlling group in a close corporation which will unduly hamper its effectiveness in managing the corporation in the best interests of all concerned. The majority, concededly, have certain rights to what has been termed ‘selfish ownership’ in the corporation which should be balanced against the concept of their fiduciary obligation to the minority . . .” (Id. at 850-51, citations omitted.)
The court went on to hold that when minority stockholders in a close corporation bring suit against the majority alleging a breach of the strict good faith duty owed to them by the majority, a court must carefully analyze the action taken by the controlling stockholders in the individual case. It must be asked whether the controlling group can demonstrate a legitimate business purpose for its action. (Id. at 851). The court added: “(w)hen an asserted business purpose is advanced by the majority, however, we think it is open to minority stockholders to demonstrate that the same legitimate objective could have been achieved through an alternative course of action less harmful to the minority’s interest ... If called on to settle a dispute, our courts must weigh the legitimate business purpose, if any, against the practicability of a less harmful alternative.” (Id. at 851-52, citations omitted.)
In this case, NFCI was a close corporation by the definition enunciated by the court in Donahue, and Rubin and Household were both minority stockholders of that corporation. It follows that Household did owe a duty of the utmost good faith and loyalty to Rubin.
Household, however, was also a creditor, indeed by far the major creditor, of the corporation. In First *615 National Bank of Boston v. Slade, 379 Mass. 243, 399 N.E.2d 1047, 1054-55 (1979), the court acknowledged that its decision in that case left unanswered the question of the extent to which a fiduciary holding stock in a corporation may also become a creditor of that corporation and assert its rights as creditor without incurring liability for breach of trust. The court noted that it had never accepted the argument that a fiduciary’s corporate trust and corporate finance functions are independent and free from collective scrutiny, and that a fiduciary assuming the additional role of creditor of a business which is owned in whole or part by the fiduciary, must accept the possibility that its conduct as a creditor may lead to a claim of breach of trust. The court concluded that future cases would have to be decided on their facts. It stated that how far, if at all, a financial institution holding a small portion of the stock of a corporation in various trusts might be held liable for breach of trust for its actions as a creditor was a matter which was not before it in that case and which would have to be dealt with when and if it arose.
The problem described by the court in Slade is-not precisely the same as the problem presented in this case. In this case Household did not become a creditor of a corporation to the stockholders of which it already owed a fiduciary duly. In this case its dual roles as creditor and minority stockholder arose simultaneously, and Household maintains that its acquisition of its shares was intended by the parties as a “kicker” to induce it to enter into the loan transaction. That difference, of course, does not relieve it of its obligations to other minority stockholders, but if may be a circumstance that can be considered in balancing the equities among the parties.
Where, as in this case, one minority stockholder of a close corporation charges another minority stockholder with having breached its duty of utmost loyalty and good faith by prevailing upon the majority stockholders to alter the terms of his employment agreement, it should be, and therefore is, open to the defendant to demonstrate that it acted for a legitimate business purpose to assure that the affairs of the corporation were managed effectively in the best interests of all concerned. Where a defendant in such a case succeeds in demonstrating a legitimate business purpose for its action, it is then open to the plaintiff to demonstrate, if he can, that the same legitimate objective could have been achieved through an alternative course of action less harmful to the plaintiffs interest. If called upon to settle such a dispute, a court must then weigh the legitimate business purpose, if any, against the applicability of a less harmful alternative. This is merely a logical and necessary extension of the principle enunciated by the Supreme Judicial Court in Wilkes v. Springside Nursing Home, Inc., supra.
At the time when Household prevailed upon NFCI to bring in a turnaround management team, NFCI was in a state of financial crisis. Its sales and hence its income had been in decline for nearly two years, and its situation had deteriorated to the point where its current liabilities exceeded its current assets by about $1.6 million. It was about to default on its obligation to reduce the principal of its debt by $2.55 million. Its line of credit had been effectively exhausted. Its financial condition was so bad that its independent auditors in its fiscal 1991 financial statement expressed “substantial doubt about the Company’s ability to continue as a going concern.”
Rubin, from the beginning, had disclaimed any expertise in financial matters. For that reason, George Enos had been employed as Chief Financial Officer, and Rubin had effectively abdicated his authority over the financial aspects of the company's business to Enos and Karen Mills. In the one financial area in which he had retained control, the acquisition and equipping of the Putnam building, there had been a cost overrun of very substantial dimension. It was apparent that a hard-nosed businessman with practical experience in dealing with financially distressed business situations was going to be required to reverse the company’s decline, and that Rubin did not have the knowledge or the experience to handle that type of situation, even with a drastic restructuring of the company’s debt structure.
Household was being called upon, at a minimum, to restructure the company’s commitments to it at very substantial cost to its own financial affairs.[9] Under these circumstances, it had a very legitimate business interest in insisting that steps be taken within the company to assure that the company’s management would be in the hands of someone with the necessary expertise to deal with the situation until the crisis was abated. On the other hand, as a fellow minority stockholder, it also had an obligation to accomplish that end in a manner least harmful to Rubin’s interests.
Household never insisted that Rubin be discharged or terminated or stripped of his salary or any of his fringe benefits. It is true that Suddath’s first suggestion was to move him gracefully into a titular position such as Chairman of the Board with no responsibilities, but Household found no fault with Thomas Brew’s plan to allow him to retain his title and his office space as well as his salary and other financial benefits, and to allow him to continue to function in the production and marketing aspects of the company’s business where he was most talented. Those were the areas in which the Argus team lacked expertise and hence needed his assistance and cooperation. I am satisfied that Household fulfilled its obligation to protect Rubin’s interests to the greatest extent possible in the light of the circumstances that existed at the time. Acting to protect its own legitimate business interest *616 (and, incidentally, the business interests of the other stockholders including Rubin) in the manner in which it did was therefore not a breach of the fiduciary duly it owed to Rubin as a fellow minority stockholder.
3. The Plaintiffs Second Theory of Improper Means
In his Trial Brief (at p. 12), the plaintiff argues that the “second improper means” utilized by Household was “inducing breach of his legally enforceable existing written contract.” He appears to argue that any inducement of breach of a legally enforceable existing written contract is ipso facto improper, and in support of that dubious proposition he quotes a passage taken out of context from Comment “f” to Restatement of Torts Second, Section 767.
Section 767 sets forth seven factors to be considered in determining whether an actor’s conduct in intentionally interfering with a contract or prospective contract of another is improper or not. Clause (d) of Section 767 describes one of those factors, “the interests sought to be advanced by the actor.” Comment “f is a comment on Clause (d). The first paragraph of Comment “f’ reads as follows:
f. The actor’s interest The correlative of the interest with which the actor interferes (see Comment e) is the interest that his conduct is intended to promote. Both are important in determining whether the interest is improper. And both are to be appraised in the light of the social interests that would be advanced by their protection.
The language quoted by the plaintiff is found in the third sentence of the second paragraph. The first two sentences of the second paragraph read:
Usually the actor’s interest will be economic, seeking to acquire business for himself. (Emphasis supplied.) An interest of this type is important and will normally prevail over a similar interest of the other if the actor does not use wrongful means.
The sentence quoted by the plaintiff then follows and reads as follows: “If the interest of the other has been already consolidated into the binding legal obligation of a contract, however, that interest will normally outweigh the actor’s own interest in taking that established right from him.”
The quoted language, when read in context, clearly refers to a situation in which the actor’s conduct is motivated by a desire to obtain business for himself in preference to a competitor. Household was manifestly not trying to obtain business for itself when it insisted that NFCI bring in a crisis management team as a condition precedent to restructuring negotiations nor was it a competitor of Rubin. The language upon which the plaintiff relies is simply inapplicable to the situation that existed in this case.
Since Household’s interference with Rubin’s employment contract was neither prompted by any improper motive nor accomplished by any improper means, Rubin cannot prevail on Count I of his complaint.
4. The Plaintiffs Claim Under Count II of the Complaint
On August 8, 1994, the plaintiff was allowed to amend his complaint by adding a new Count II. In that count he charged Household with a breach of the fiduciary duty owed to him as a fellow stockholder of NFCI, and in the 11th paragraph of the complaint (the 3rd paragraph of the new Count II) he made it clear that the conduct of which he complained was his alleged “constructive termination” from his position of Chief Executive Officer of the company.
At the outset of the trial of this case, when the plaintiff began to introduce evidence of the events leading up to the creation of NFCI, its purchase of the assets of the old National Felt Company, the terms and conditions of its loans from Household and the Security Agreement and Rubin’s employment contract, the defendant objected to any claim of breach of a fiduciary duty based upon those events. Its objection was based on the ground that the pleadings had not suggested any such claim and for that reason it was not prepared to defend against any such claim. The plaintiff did not take issue with that objection. I nevertheless allowed admission of the evidence because I deemed it appropriate to have knowledge of the entire background of the present controversy.
In footnote #4 on page 20 of his trial brief, the plaintiff refers to what he terms the “obscene parceling out of the spoils by the two major stockholders, Jacobs and Household, to themselves on the very first day of the corporation’s existence,” and describes the fees and contracts that are also described in the second paragraph of Section I (3) above. He acknowledges, however, that this was not the main thrust of his case and makes no claim for relief based on those events. Whatever may be said about the propriety of those fees and contracts, this case was neither pleaded nor tried on the theory that they violated any duty due to the plaintiff.
The claim of the plaintiff on which the case was pleaded and tried is disposed of by what is written in Section II (2) above. Although Household did owe a fiduciary duty to Rubin, it did not breach that duty. Rubin is therefore entitled to no relief under Count II of his complaint.
4. Rubin’s Claim of Constructive Discharge
In addition to the fact that Household’s interference with Rubin’s employment contract was not improper under the circumstances in which it occurred, and to the fact that it did not constitute a breach of its fiduciary duty of utmost good faith and loyalty owed to him, I am also of the opinion that the manner in which he was treated did not amount to a constructive discharge. Rubin was not told that he was discharged and he was not deprived of his salary, his title, his *617 office space or his fringe benefits. Nor was he relegated to a position with no duties or responsibilities. Argus needed and wanted him to continue to work in the production and marketing aspects of the company’s business, and Thomas Brew made him aware of Argus’ intentions in that regard. Those were a substantial part of the functions he had been performing before Argus came in. Brew told him that they needed and wanted his cooperation. While it is true that he was going to be working under Argus for some period of time, it was not contemplated that it would be a permanent arrangement. The object of the crisis management team was to abate the crisis situation and return the company to its owners of who Rubin was one. Rubin simply quit against the wishes of both NFCI and Argus.
The question of what one must prove to establish a constructive discharge was very recently considered by the Supreme Judicial Court for the first time in GTE Products Corp. v. Stewart; Langford, 421 Mass. 22, 653 N.E.2d 161 (1995). In that case the court said, citing the United States Court of Appeals for the First Circuit, that in order for a constructive discharge to be found the trier of fact must be satisfied that the new working conditions would have been so difficult or unpleasant that a reasonable person in the employee’s shoes would have felt compelled to resign. “The test is met,” the court said, “if, based on an objective assessment of the conditions under which the employee has asserted he is expected to work, it could be found they were so difficult as to be intolerable.” The court noted that a single, isolated act of an employer or an agent of the employer usually will not be enough to support a constructive discharge claim. The adverse working conditions must be unusually aggravated or amount to a continuous pattern before the situation will be deemed intolerable.
Under all the circumstances that existed in this case, the situation in which Rubin found himself when Argus took over was not so difficult that a reasonable person in his position would have found it to be intolerable. He was not justified in quitting when he did. It follows that the damages for which he seeks recovery were the result of his own actions.
Accordingly it is ordered that judgment be entered for the defendant dismissing the plaintiffs complaint with costs.

The subsidiaries were a New York corporation called “Herbal Sales Corporation” and a Massachusetts business trust called “Fibredyne Company” which were sales agents of National Felt Company in New York and Boston, respectively.

Among assets expressly excluded from the sale were: “all cash, cash equivalents, commercial paper, marketable securities and other investments (other than the amounts deposited with Blue Cross under the BC/BS Agreement and all assets attributable to the programs listed in Section 8.2.7.” (§1.2[iii].) As of the time of sale, the total amount of cash, marketable securities, short-term commercial paper and money-market mutual funds was approximately $8,140,000. (See Exhibit A attached to the Asset Purchase Agreement.)

On August 1, 1988, Newco paid Eli S. Jacobs an “initial fee” of $250,000 for services as a consultant for the fiscal year ending July 31, 1989. This payment was acknowledged in a contract dated January 18, 1989 in which Newco agreed to retain Eli S. Jacobs as a consultant to provide certain management and consulting and advisory services relating to the business and affairs of the company and the review and analysis of certain financial and other transactions after July 31, 1989. Newco agreed to pay for such future services an annual fee of $250,000 plus 25% of the amount by which Adjusted Operating Profit exceeds the amount equal to Newco’s earnings before depreciation, amortization, interest and taxes as set forth in certain attached Management Projections, but not in excess of $250,000. The contract specifically provided that Jacobs would not be required to devote any specified amount of time to any request for consulting services, and would be required to devote only so much time as the consultant, in its reasonable discretion, deemed necessary to complete the services.

Newco in fact made the first two payments in accordance with that schedule. During the first two years it reduced the SRTL principal by a total of $2,380,000. During that same period of time it paid Household $13,800,000 in interest, so its total payment of principal and interest during that period was $16,180,000.

As of the time of the trial of this action in December of 1995, the cost of polyester had receded slightly, but the cost of rayon had never come down.

The latter figure included $5,111,000 in “restructuring costs,” which consisted of the costs in the fourth quarter of fiscal 1991 of a series of actions to restructure product lines and business strategies. They consisted primarily ofwrite-offs of inventory, severance and other costs associated with terminated employees.

See §6 supra.

Earnings before interest, taxes, depreciation and amortization.

As pointed out above, its actual concessions ultimately far exceeded that minimum.