Sanders, Janet L., J.
At issue in these two consolidated actions is an arbitration award finding in favor of The Boston Foundation (‘TBF”) and AE Gauguin, Inc. (“AEG”), and against HR Gauguin, Inc. (“HRG”). Not surprisingly, HRG seeks to vacate the award, and TBF together with AEG seeks to have it confirmed. After review of the 23-page unanimous arbitration decision as well as those exhibits and those portions of the transcript cited by the parties in their memoranda, this Court concludes that the award should be Affirmed.
BACKGROUND
The procedures and the substantive law governing the parties in the event of a dispute is set out in the Amended and Restated Cross Purchase Governance Agreement (the “Agreement”). The Agreement includes among other things an arbitration clause and a choice of law clause *517 stating that the Agreement is to be construed and enforced according to the laws of the Commonwealth of Massachusetts. The Agreement also gives each party the right to seek specific performance and sets only one limitation on the ability of an arbitration panel to award damages, which is that it may not award “consequential, treble or exemplary damages.”
In December 2009, AEG filed a Demand for Arbitration under the Agreement, seeking an accounting and production of certain information concerning the operations of the Paul Gauguin, a luxury liner operating in French Polynesia. The Gauguin had been purchased jointly by two brothers, Henry Lewis (operating through HRG) and Alan Lewis (operating through AEG). In connection with this purchase, the brothers formed Paul Gauguin Holding Limited (“PG Holding”), which held title to the ship through its wholly owned subsidiary PGSL. The Agreement governed the relationship between these various entities, with AEG owning 50 shares of PG Holding and HRG owning the other 50 shares. Subsequently, Alan (through AEG) made a charitable donation of the majority of his shares to TBF, which then became a party to the Agreement. Henry donated three of his shares.
After the initial filing, AEG amended its demand to include additional claims including one alleging that HRG had breached its fiduciary duties to AEG and TBF. A panel of three arbitrators was convened, and a hearing was held over six days in October and December 2010. In a decision dated March 14, 2011, the panel unanimously agreed that HRG had breached its fiduciary duty and its obligation of good faith and fair dealing both to AEG and to TBF. It ordered HRG to pay TBF $29,240,000 for its shares in PG Holding, with interest running from August 2009. It also ordered HRG to reimburse PGSL for $2,437,000 in excessive management fees. Finally, HRG was required to pay the costs of the arbitration.
In support of the award, the arbitrators found the following facts. Henry Lewis made his gift to TBF in December 2007 with the expectation that the ship the Gauguin would soon to be sold and his contribution to TBF would be quickly converted into cash. This was important, because TBF otherwise faced serious tax penalties if it held onto the shares in PG Holding for more than five years. In December 2008, HRG (per the Agreement) took control of PG Holding and PGSL, and assumed exclusive responsibility for management and operation of the Gauguin. That same month, HRG received an “expression of interest” from the Pacific Beachcomber to buy the ship for $70 million. The Beachcomber was well capitalized and had a special interest in buying the Gauguin because its own tourist and hospitality operations were based in French Polynesia. The sale would also have relieved TBF of the prospect of the tax penalty by allowing it to monetize the contribution of shares it had received from Alan.
Heniy Lewis knew ofTBF’s tax dilemma, however, and decided to capitalize on it. He decided not to inform either AEG or TBF about the Beachcomber’s strong interest in buying the ship and instead devised a scheme intended to force TBF into selling its shares to HRG at a discounted price. While keeping TBF in the dark about the negotiations with Beachcomber, HRG also falsely suggested to TBF that a capital call might be required in 2009 to subsidize refurbishment to the ship. In early 2009, HRG made two offers to TBF to buy its shares in PG Holding, one for $15 million and the other for $17 million. If the Beachcomber sale went through, these shares would have been worth twice that amount.
When TBF rejected the offers, HRG approached Beachcomber with a proposal to charter the boat over a period of years, with an option to buy at some point in the future. Although Beachcomber expressed its strong preference for an outright sale, it ultimately agreed to this lease arrangement, which was assigned a present value by the parties of $68 million (approximately what Beachcomber had offered to pay for the Gauguin in a purchase). The sole purpose for HRG insisting on a charter instead of a sale was to materially enhance its ability to “squeeze” TBF, since the boat would still be under the charter agreement in December 2012 when TBF would have to divest itself of its PG Holding shares to avoid the tax penalties. It was this “squeeze play” which the arbitrators found to constitute a breach of HRG’s fiduciary duty to TBF. As a remedy, the panel ordered HRG to buy TBFs shares at a price of $29,240,000 (representing its 43 percent share in the $68 million).
The arbitrators also found that Henry Lewis caused PGSL (the company with title to the ship) to pay his travel agency Vantage Travel, a “management fee” of $125,000 a month between January 2008 and August 2009a total of $2,437,500. This was on top of a “strategic management fee” that Henry caused to have paid to Vantage in the same time frame. Although the latter fee was not unreasonable, the $2,437,500 was and the panel ordered Henry (through Vantage) to repay PGSL that sum. They declined to require either PGSL or PG Holding to distribute any of this reimbursement by way of a dividend: HRG was ninety percent owner ofPG Holding (after the forced repurchase of TBFs shares): so long as it did not conduct itself in the future in bad faith, it was free to make distributions and dividend payments in accordance with its best business judgment.
DISCUSSION
The parties agree as to the scope of judicial review: it is quite narrow. That is because of a strong public policy in favor of confirming arbitration awards: the parties have chosen that method as a way to resolve their disputes and courts should not interfere. As the Supreme Judicial Court stated in City of Lynn v. Thompson, 435 Mass. 54,61 (2001), “[a]n arbitrator’s result may be wrong; it may appear unsupported: it may appear poorly reasoned; it may appear foolish” yet even under those circumstances, a court should not intervene. “Absent fraud, errors of law or fact are not sufficient grounds to set aside an award.” Plymouth Carver Regional School *518 Dist. v. J. Farmer & Co., Inc., 407 Mass. 1006, 1007 (1990). “Even a grossly erroneous decision is binding.” Ibid., quoting Trustees of Boston & Me. Corp. v. MBTA, 363 Mass. 386, 390 (1973). In light of the standard that I apply in reviewing the award before me, this Court does not feel the need to discuss most of HRG’s arguments beyond simply referring to the Memoranda of Law submitted in support of confirming the award; those mem-oranda more than adequately explain why those arguments lack merit. This Court does address, however, HRG’s primary basis for seeking an order to vacate the award, which is that the arbitrators ignored the Agreement and imposed their own brand of corporate justice on the parties in “manifest disregard for the law.” This Court strongly disagrees.
It is true, as HRG notes, that the Agreement gave HRG “sole and exclusive” authority to manage the operations of PG Holding and its subsidiaries, including PGSL. The same Agreement also gave HRG sole control over whether to sell the ship or not and if so, on what terms. The arbitrators acknowledged that authority, as well as the general premise that sophisticated parties should be held to their agreements, whatever the hardship is to one or the other. That does not give the controlling owner in a close corporation the right to defraud and exploit other shareholders, however. As the majority shareholder in PG Holding, HRG owed a fiduciary duty to act in utmost good faith and loyalty to its fellow shareholders, AEG and TBF. Donahue v. Rodd Electrolyte Co., 367 Mass. 578, 587 (1975); see also Pointer v. Castellani, 455 Mass.537, 554 (2009). Conduct motivated by avarice and self dealing has no place in this setting.
In holding that there had been a breach of fiduciary duty in the instant case, the panel found that the sole reason for chartering the Paul Gauguin to Beachcomber instead of selling it was to secure TBF’s shares at a heavily discounted price. To the extent there were alternative explanations for that decision offered by HRG, the panel determined them to be “not credible.” Without reviewing the entire transcript of the proceedings, this Court finds ample factual support for the panel’s finding in the testimony of George Trant, who worked at a senior level of management in Heniy Lewis’s company Vantage Travel. Trant had direct responsibility for the management of the Paul Gauguin. As Trant described it, he, Henry Lewis and Harry Melikian, executive vice president of Vantage and a director of PG Holding and PGSL, discussed the Beachcomber’s offer to buy the Gauguin in early 2009.
Although it was pointed out in that conversation that the proceeds from the sale would have to be divided among the three shareholders according to their percentage ownership, Trant testified:
Harry made it very clear that there was a way around the foundation [TBF] getting the money by some tax law that he had researched and that there was a five year period by which the charitable foundation would have to do something with their ownership. I’m not exactly clear whether it was divest all of it, part of it, some of it, and that there was a way to kind of push them into settling for less . . .
Q. And what did Mr. Melikian tell you with respect to the offer that was made by the Beachcomber?
A. Nothing other than just that they were not going to accept the offer and that there was a way around to get more money for Mr. Lewis, for Hank [Heniy] Lewis.
Asked to explain again what that “way around” was, Trant testified:
My understanding is when that offer was refused, that then Harry said that there was a tax consequence to the foundation [TBF] after five years and that if he could do a charter agreement that was longer than five years, that would, you know, force the charity to, you know, into probably having to give up their equity soon. There was a way of kind of putting the squeeze on the charity by doing that, in his words.
Mr. Henn [one of the arbitrators]: What did you just say? In his words?
Trant: In his words, Harry said he could squeeze the charily. He said some other things which I won’t say here.
Q: You mean other profane language as well?
A: Yes.
Henry Lewis was present in the room for this conversation. Although Melikian did not himself acknowledge such a conversation, he did admit that he was the one who communicated with TBF on Heniy Lewis’s behalf and conducted the negotiations with the Beachcomber for HRG.
In its post-hearing brief to the arbitration panel, AEG and TBF counsel called this a “classic breach of fiduciary case.” This Court is inclined to agree. What makes it particularly offensive is that the victim of HRG’s greed was a charitable foundation. Although HRG characterizes the award to TBF as one of consequential damages, this Court concludes that it was rather the arbitrator’s attempt to compensate TBF for the harm that was done to it by HRG’s wrongful conduct. Using $68 million (which was the present value that the parties assigned to the charter arrangement), the panel required HRG to buy TBF’s shares at a proportionate price, much like the remedy suggested by the SJC in Donahue, supra. In short, the panel’s decision does not only pass muster according to the standards that I must apply in reviewing an arbitration award. It also appears to this Court to be well reasoned, factually supported, and legally correct.
CONCLUSION AND ORDER
For all the foregoing reasons and for other reasons set forth inAEG’s and TBF’s Memoranda of Law, their Motions to Confirm the Arbitration Award is ALLOWED, and HRG’s Motion to Vacate the Arbitration Award is DENIED. Judgment shall enter in the form proposed by AEG.